## ILLINOIS CENT. R. CO. v. FOLEY et al.

(Circuit Court of Appeals, Eighth Circuit. December 6, 1892.)

RAILROAD COMPANIES—NEGLIGENCE—DEFECTIVE PREMISES.

A shipper of cattle by rail, accompanied by a helper, went with them on the train to look after their needs while in transit, according to the custom and requirement of the railroad company. Learning that an animal was down in one of the forward cars, the two men went forward at a station where the train stopped to water, (the conductor having told them that there would be time to look after the cattle if they hurried up;) and on reaching the car the shipper told the helper to go around in front of the engine to the other side of the train, and hold up the lantern, while he himself got the animal up with his prod. The station was near a creek spanned by a bridge, and, when stopping to water, the engine was some distance upon the bridge. The bridge carried the main track and a switch, and was planked between the two tracks and between the rails, but on the outer side of the main track there was only a narrow footpath or shelf for the use of the employes in oiling the engine. The night was very dark, and the helper, after passing the front of the engine, stepped over the edge of the rail, and fell to the creek below. Shortly afterwards his employer was found beside him, dead. The depot platform extended nearly to the water tank, and all the buildings and facilities for business at the station were between the depot and the bridge; and, when trains going westward stopped to water, passengers were frequently required to get off on the opposite side of the bridge, as the train would not stop again at the station. *Held,* in an action to recover for the death of the shipper, that on these facts the court properly refused to direct a verdict for the company, and submitted the case to the jury, with instructions that it was mainly a question whether the bridge was such a part of the depot grounds as that the shipper was entitled to use it for the purpose of looking after his cattle, and that the company was bound to see that proper planking and guard rails were maintained.

In Error to the Circuit Court of the United States for the Northern District of Iowa. Affirmed.

Statement by CALDWELL, Circuit Judge:

This is an action brought by M. J. Foley and Nora M. Kelley, administrators of the estate of M. B. Kelley, against the Illinois Central Railroad Company, to recover damages for the death of the intestate, M. B. Kelley, which it is alleged was brought about by the negligence of the railroad company.

On March 18, 1890, M. B. Kelley, the owner, delivered at Manson station, in Iowa, to the Illinois Central Railroad Company, for transportation over its road to Chicago, eight car loads of live stock. The train carrying this stock was what is known as a "special stock train," which runs through to Chicago with all convenient speed, and makes no stops except for coal and water. Shippers of live stock are required, by a regulation of the railroad company, to take care of their stock while in course of transportation, and for that purpose they, or their agents, are required to accompany the train that carries the stock; and they are expected to look after and care for it when the train stops for coal and water. The train hauling Kelley's stock consisted of 17 cars. The total length of the train, including the engine and tender, was about 650 feet, and Kelley's stock was in the first 8 cars, counting from the tender. Kelley, with a helper, Mulroney, was on the train to look after his stock. At Dubuque, a steer in the car next to the engine was seen to be down. Between 8 and 9 o'clock at night the train reached Council Hill station, in Illinois, where freight trains going east commonly take water; and this train stopped there, in the accustomed place, for that purpose. The conductor told Kelley the train would stop five minutes, and that he would have time to look after his cattle "if he hurried up;" and, just as the train stopped, Kelley, with a prod and lantern, and his helper, with a stick, got off on the south side of the track, and hurried towards the head of the train to look after the steer that was down in the car next to the tender. The conductor saw them start, and knew their business was to look after the stock. When they got to the front end of the car, next to the tender, Kelley gave the lantern to his helper, and told him to go around on the other side of the car, and hold the light up so he could see the cattle. The helper took the lantern, and started to walk around in front of the engine, as directed, and what befell him is thus told by himself: "Just as I got in front of the engine, it kind of started, and the steam kind of went off, and I had the impression that the engine was about to start I stopped. The light was in my hand. The thought came to my mind, what would I do,—go back or forward; and, without giving it a second thought, I stepped over the north rail. I saw nothing but black. I was looking towards my feet. I took one step, and I was in the air. The next I remember was seeing Mr. Kelley beside me, dead. I knew it was he, for some reason or other. My recollection is, I was sitting in the water, his body a few feet from me. It must have been a headlight that gave me the view. I do not know how long I was there. I was only conscious a few seconds. Don't know when I was taken out. I remember of making a noise,—a kind of loud groan. The next I recollect I was lying on a cot in Passamore's store. Before I fell, I could see nothing but just black. It looked beyond the rail just like the rest of the place,—nothing but darkness. There was no guard rail or obstruction to prevent my going over. I passed across the track, ahead of the nose of the engine, a few feet. When I stepped over the rail, there was no steam, I had passed that. The headlight was there, but it didn't show me anything at my feet. The headlight struck about my shoulders, I should think. It did not enable me to see. Was holding lantern in right hand, and had a prod with me. When Kelley said we would go to the head of the train and work back, the conductor was right there. After I left Mr. Kelley, to go around the engine, I did not know, by touch, feeling, or sight, when I struck the bridge. I had a pair of rubbers on. Mr. Kelley had also rubbers. I saw him put them on. When I saw Mr. Kelley last, he was at the back of the tender, at the end of the head car. When he gave this direction, I turned right around and left him. I have no knowledge how Mr. Kelley came around there,—only supposition."

It appears from the evidence that there is a bridge running east and west, 122 feet long, over a stream at this station, and that the front end of an engine going east, when it is taking water, extends 30 feet onto this bridge, from the west end thereof. The main track and switch pass over the bridge, which is planked between the two tracks and between the rails, and there

is a narrow planking outside of the north rail of the main track, which extends about 30 feet from the west end of the bridge, and is used by the employes while oiling the engine, but there is no planking beyond this point on the outside of the north rail of the main track, and no guard; and one passing around the engine from the south to the north side would, as soon as he stepped over the north rail of the main track, be precipitated to the rocky bed of the creek. a distance of 17 feet. This is just what happened to Kelley and his helper; the fall killing the former, and seriously injuring the latter. The distance from the west end of the bridge to the depot is 229 feet. The water-tank is between the depot and the bridge, the center of the tank being 20 feet from the west end of the bridge. The depot platform extends nearly to the water tank, and all the buildings and facilities for business at the station are between the bridge and the depot. The evidence shows that freight trains going west that carry passengers take water at this tank and do not always pull up and stop at the depot to let the passengers off, but that the passengers have to get off on the east side of the creek, and cross the bridge, to reach the depot; and passengers purchasing tickets for freight trains are sometimes sent across the bridge by the station agent to take the caboose. Passengers on freight trains going west get off where the caboose happens to be when the engine stops to take water. The customary method of proceeding at night, where there are two men looking after cattle, is for one of them to hold the lantern and the other to use the prod, and when a steer is down, near the end of the train, it is usual for one of them to go round the nearest end of the train, whether it be the engine or caboose, with the lantern, to enable the other to look through the car and do his work. The night was so dark and misty that a lantern shed light but a very short distance. One witness testifies that, with a lantern and a torch or two, "we could not see to distinguish anything outside of the little space around us."

That part of the charge of the court relating to the material issue in the case was as follows: "It seems to me, gentlemen, that the main question for your consideration in this case is as to the use expected to be made of the bridge, and as to its condition. Was this bridge at Council Hill a place where, as the business of the company was ordinarily carried on, it should reasonably have been expected and foreseen by the company that when stock trains would stop at the water tank, for the purpose of taking water for the use of the engine, the men engaged in looking after the stock would naturally go upon the bridge when thus employed? Was such a use, in fact, made of it? It is for you to say, under the evidence, whether or not that bridge was or was not such a part of the Council Hill station grounds, in the use that was made of it, as that the stockmen, including Mr. Kelley, when transporting cars of stock over that line of railway, had a right to go upon the bridge when they were called upon to go about the train of the company for the purpose of examining their stock. The evidence shows that when the engine is placed in position at the water tank, so that water can be taken, it will extend some distance on the bridge; and, of necessity, persons seeking to pass around the front end of the train, thus placed, must go upon the bridge. Now, under these circumstances, was that bridge a part of the yard or premises of the company, so that the company should have reasonably foreseen that stockmen would use it when examining their stock in the train? And were or were not such stockmen, including Mr. Kelley, justified by the practice of the company in making use of the bridge as part of the yard of the company when looking after their stock? If, by the usage of the company, they were justified in using the bridge as part of the premises of the company, where they were expected to go in examining their stock, then the duty rested upon the company of exercising ordinary care to put and keep the bridge, as part of the company's yard, in a reasonably safe condition for the use of parties engaged in shipping stock over defendant's line of railway. If, however, the bridge did not form part of the station grounds, and the company did not hold it out to the public as a place to be used for the purpose for which Mr. Kelley used it, then you cannot hold the company responsible for the consequences resulting from it being so used by him, because in that case the company would owe him no duty or obligation to keep the bridge safe for such use. If, however, you find that the bridge was a part of the defendant's premises at Council

Hill, which Mr. Kelley was justified in using, under the instructions given you, when engaged in examining his stock, and that he was justified in endeavoring to pass around the front end of the engine, in the position in which it was placed, then the next question will be as to the condition of the bridge for such use. As I have already said to you, the rule on that point is that the company is required to use ordinary care—such a degree of care as men of ordinary prudence should exercise where human life or limb may be exposed to danger—in keeping its premises, where the public are invited to come in transacting business with the company, in a reasonably safe condition, so that in the use thereof no unnecessary risk or danger is cast upon the public."

There was a verdict and judgment for the plaintiffs, and the defendant sued out this writ of error.

*John F. Duncombe*, for plaintiff in error.

*A. N. Botsford, M. F. Healy*, and *Thomas D. Healy*, for defendants in error.

Before CALDWELL and SANBORN, Circuit Judges.

CALDWELL, Circuit Judge, (after stating the facts.) It is assigned for error that the court refused, at the close of the whole evidence, to give a peremptory instruction to the jury to find a verdict for the defendant. The case should not have been withdrawn from the jury unless the conclusion followed, as matter of law, that no recovery could be had, upon any view which could be properly taken of the facts the evidence tended to establish. Railway Co. v. Cox, 145 U. S. 593, 606, 12 Sup. Ct. Rep. 905. We think the evidence tended to establish that the bridge was a part of the station grounds, and used as such by the railroad company, and by those having business with the company or its trains at the station, and that the company knew, or ought to have known, that shippers of stock, accompanying its freight trains, would have occasion to go upon the bridge, in going around the train to look after their stock, while the engine was taking water at the tank. If these were the facts, the company was undoubtedly guilty of negligence in not planking the bridge on the north side of the main track and placing proper guard rails around it, or taking other suitable means to guard against accidents like that which instantly killed Kelley and came near killing his helper. The charge contained a very clear and accurate statement of the rules of law applicable to the case; and the court properly left it to the jury to say, whether, applying these rules to the facts and circumstances of the case, the defendant had been guilty of negligence. It was emphatically a case where the question of negligence was one for the determination of the jury, under proper instructions from the court. That the evidence tended to establish negligence was enough to make it the duty of the court to submit that issue to the jury. Where negligence may be fairly deduced or inferred from proved or conceded facts, the case must be left to the jury. Neither this nor any other court can set aside the verdict of a jury simply because the court would have reached a conclusion different from that of the jury, upon the facts. To do so would be to usurp the functions of the jury. In a case involving questions of negligence, the supreme court, speaking by Mr. Justice Miller, said:

"But we think these are questions for the jury to determine. We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these, as well as others." Jones v. Railroad Co., 128 U. S. 443-445, 9 Sup. Ct. Rep. 118.

And in the case of Railway Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. Rep. 679, the court, speaking by Mr. Justice Lamar, says:

"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered one of law, for the court."

In the case of Railroad Co. v. Stout, 17 Wall. 657, 663, 664, we think the evidence of negligence was not so strong as it is in this case, and the court said:

"The evidence is not strong, and the negligence is slight, but we are not able to say that there is not evidence sufficient to justify the verdict. We are not called upon to weigh, to measure, to balance the evidence, or to ascertain how we should have decided, if acting as jurors. * * * Certain facts we may suppose to be clearly established, from which one sensible, impartial man would infer that proper care had not been used, and that negligence existed. Another man, equally sensible and equally impartial, would infer that proper care had been used, and that there was no negligence. It is this class of cases, and those akin to it, that the law commits to the decision of a jury. Twelve men of the average of the community, comprising men of education and men of little education, men of learning and men whose learning consists only in what they have themselves seen and heard,—the merchant, the mechanic, the farmer, the laborer,—these sit together, consult, apply their separate experience of the affairs of life to the facts proven, and draw a unanimous conclusion. This average judgment thus given, it is the great effort of the law to obtain. It is assumed that twelve men know more of the common affairs of life than does one man; that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge. In no class of cases can this practical experience be more wisely applied than in that we are considering. We find accordingly, although not uniform or harmonious, that the authorities justify us in holding, in the case before us, that, although the facts are undisputed, it is for the jury, and not for the judges, to determine whether proper care was given, or whether they establish negligence."

And see Railway Co. v. Jackson, L. R. 3 App. Cas. 193, 47 Law J. C. P. 303; Railway Co. v. Slattery, L. R. 3 App. Cas. 1155. In Pollock on Torts, (page 381,) the learned author says:

"The tendency of modern rulings of courts of appeal has been, if not to enlarge the province of the jury, to arrest the process of curtailing it."

It would serve no useful purpose to set out in detail all the evidence in the record, and point out wherein it is sufficient to support the verdict of the jury. It is enough to say that we have carefully considered it, and that, in the light of the authorities we have cited, the question of negligence was properly left to the consideration of the jury, whose verdict is not without evidence to support it.

The judgment of the circuit court is therefore affirmed.