## MISSOURI, K. & T. RY. Co. v. SHEPHERD.

No. 734, Ind. T. Opinion Filed April 13, 1908.

(95 Pac. 243.)

1. NEGLIGENCE—Question For Jury. In cases involving the question of negligence, the rule is now settled that, "when a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered one of law for the court."

2. RAILROADS — Negligence — Lookout for Stock — Instruction.

Opinion of the Court.

Under the laws in force in that portion of the state known as Indian Territory prior to its admission as a state, an instruction in reference to the duty of railroads towards stock that "the company is required to keep a lookout for stock, and, if they keep a proper lookout and are not able to discover it in time to stop their train, they are not responsible," is not erroneous.

(Syllabus by the Court.)

*Error from the United States Court for the Central District of the Indian Territory, at South McAlester; before Wm. H. H. Clayton, Judge.*

Action for damages by Walter Shepherd against the Missouri, Kansas & Texas Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

On July 1, 1905, there was filed in the office of the United States commissioner for the Wilburton commissioner's district, Central district of Indian Territory, a complaint by Walter Shepherd against the Missouri, Kansas & Texas Railway Company, in which he charged the said company with having negligently killed a sorrel mare belonging to him, and asked damages for the same. On the trial of this cause judgment was rendered in his favor, and the case was appealed by the company to the United States court for the Central district of Indian Territory at South McAlester, where, on retrial, plaintiff again secured judgment, from which the railroad company appealed to the United States Court of Appeals for the Indian Territory, and the case is before us by virtue thereof.

*Clifford L. Jackson* and *Brewer & Andrews,* for appellant.
*Arnote & Bain,* for appellee.

DUNN, J. (after stating the facts as above). There are three specifications of error alleged by plaintiff in error, as follows:

"(1) The trial court erred in refusing to instruct the jury to return a verdict for the defendant as requested by counsel for plaintiff in error. (2) The trial court erred in instructing the jury in this case as follows: 'The company is required to

keep a lookout for stock, and, if they keep a proper lookout and are not able to discover it in time to stop their train, they are not responsible.' (3) The trial court erred in overruling plaintiff in error's motion for a new trial."

The proposition raised by the first specification of error strikes directly at the verdict, and presents for our consideration the question of whether or not there was any evidence to sustain it, or, if the verdict was such "that all reasonable men would agree that it was not supported by the evidence and should be annulled." (*Gulf, C. & S. F. Ry. Co. v. Ellis, infra.*) On the physical facts surrounding the case there is practically no dispute. The point of contact between these parties arises out of the facts transpiring at the time of the collision of defendant's engine and plaintiff's animal.

The evidence shows that the track of the Missouri, Kansas & Texas Railway Company through the town of Canadian, Ind. T., the place where the animal was killed, is almost a perfectly straight and a practically level track from the crossing north of the depot to the crossing south of the depot; the distance between these crossings not appearing definitely, but between them located on the east side of the track is a depot, and 80 yards south of that an old box car used for a toolhouse. From the toolhouse to the crossing south of the same is a distance of about 200 to 250 yards. On the west side of the track, and a little south of the depot, is a cotton platform. South of the platform is an ice-house and a cotton seedhouse. South of them are located the stockyards and a granary. Between the buildings on the west side of the track and the main line of the railroad there are several lines of switches, and on them, at the time of the killing mentioned, was a string of box cars. The train which killed the animal was coming from the north, and consisted of an engine and caboose car, running at a speed of 30 to 35 miles per hour. The mare in question was grazing at the side of the track a short distance south of the toolhouse, and to the east of the main track, and within a few feet thereof, when the engine and caboose car

approached. At this time all parties agree the mare started to run across the track in front of the approaching train. The engineer in charge of the engine testified:

"I don't suppose I was over 150 feet from where the horse was when I first saw it start towards the track, and, of course, I put in the emergency just as soon as I saw the horse start for the track. About the time I put in emergency it struck, and it did not slack my speed very much, so I released her again, and, when I looked out and seen the horse laying on the pilot, I applied emergency again for fear the horse would roll off under the engine and ditch the engine."

On being questioned as to how far in his judgment it was below the toolhouse where he struck the mare, he states: "Could not have been over 25 or 30 feet"; that at the rate of speed he was going it required 500 or 600 feet for him to bring his train to a stop, and it was running from 44 to 50 feet per second. The evidence of the engineer thus given was corroborated by two or three witness on the question of where the mare was when struck, and was that upon which the company relied before the jury to show there was no negligence. The testimony of witnesses for plaintiff differs from this evidence, in that witness John West testifies that the "animal leaped across the track, turned right down south, and ran on down 80 or 100 yards, and maybe further. Don't know the distance. Then she turned back towards the east side of the railroad, and got in the middle of the track, and started down it." She made three or four jumps before the engine struck her. On cross-examination this witness gave the following testimon:

"Q. How far was it from where the animal crossed the track first to where she was struck? A. One hundred yards; might have been more. May be 120 where she was struck. Q. It might have been 400? A. No; it was not 400. Q. What is your judgment? A. About 120 yards."

Another witness, John Lancy, testified:

"She got frightened, and went over to the west side, and then run down the track and tried to get away. I suppose she tried

to get back across the track—she run down a little past the stock-yards I suppose, and got on the track, and maybe made four or five jumps down the track when the engine hit her."

When interrogated as to how far she ran before she was caught said: "Well, I suppose between 100 and 130 yards."

While not stating all the evidence given on either side, that quoted is sufficient to show the different theories presented to the jury. The defendant in error admits in his brief that "if the animal was killed where the engineer and other witnesses for plaintiff in error testified it was struck by the engine, it is clear that the engineer could not have stopped or checked up the speed of his train sufficient to have prevented striking the animal." He contends, on the other hand, that if his theory is correct, and his evidence is true, then the plaintiff in error was negligent in not retarding the speed of the train to such an extent as to have permitted the animal to have escaped, arguing that if the train could have been stopped in 500 or 600 feet, adding 150 feet which the engineer testifies was the distance that the mare was from him when he first saw her to the 300 or 360 feet which was the point at which she was struck after crossing the track as testified to by West and Lancy would make a distance of from 450 to 510 feet that the engineer had in which to so slack his train as to enable the animal to escape being struck.

Under these facts and the record made, the question now arises: Should the court or the jury decide it? Would all reasonable men draw the same conclusion from this evidence? Is there no room for honest difference of opinion among men of reason, judgment, and discretion? We cannot say so. Judge Caldwell, in the case of *Gulf, C. & S. F. Ry. Co. v. Ellis*, 54 Fed. 481, 4 C. C. A. 454, presents the best discussion of the proper evidence of the court and the jury that we have ever seen. Its fullness, clearness, and logic are so marked that no extenuating plea is necessary for the generous quotation which we make from it:

"In common-law actions tried to a jury this court cannot review or retry the facts. If there is any evidence, direct or cir-

cumstantial, fairly tending to support the verdict, it must stand. Every presumption is in its favor, and all doubts must be resolved in its favor. This court will not weight or balance the evidence. And in cases like the one at bar, which turn on the question whether the party exercised ordinary care or was guilty of negligence, after the usual and appropriate definitions of those terms by the court, it is the province of the jury to say from a consideration of the evidence whether in the particular case ordinary care was exercised, or whether there was negligence. In other words, what is ordinary care, or what is negligence in the particular case is a question of fact for the jury, and not of law for the court. *Railroad Co. v. Stout,* 17 Wall. 657, 663, 664, 21 L. Ed. 745; *Jones v. Railroad Co.,* 128 U. S. 443-445, 9 Sup. Ct. 118, 32 L. Ed. 478; *Railway Co. v. Ives,* 144 U. S. 408, 417, 12 Sup. Ct. 679, 36 L. Ed. 485; *Railroad Co. v. Foley,* 53 Fed. 459, 3 C. C. A. 589; Pol. Torts, 386 *et seq.* But in the trial of every case before a jury there comes a time when it may be the duty of the court to decide as a matter of law whether there is sufficient evidence for the jury to found a verdict upon. If there is not, the practice in the federal courts is to instruct the jury to return a verdict for the defendant. *Railroad Co. v. Converse,* 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213. But the case should not be withdrawn from the jury unless the conclusion follows as a matter of law that no recovery can be had upon any view which can be properly taken of the facts the evidence tends to establish. *Railroad Co. v. Cox,* 145 U. S. 593, 606, 12 Sup. Ct. 905, 36 L. Ed. 829. And, in cases involving the question of negligence, the rule is now settled that, 'when a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered one of law for the court.' *Railway Co. v. Ives, supra.* The presumption is that jurors are reasonable men, and that the trial judge is a reasonable man, and when the judge and jury who tried the cause concur in the view that the evidence establishes negligence, every presumption is in favor of the soundness of that conclusion. The whole fabric of our judicial system is grounded on the idea that jurors are better judges of the facts than the judges. By the Constitution of the United States, and

by the Constitutions of all the states of the Union, juries are made the judges of the facts in all common-law actions. These constitutional provisions are founded on centuries of experience, and every day's practice confirms their wisdom. It may be said of our contitutional provisions, on the subject of juries, as it has been said of the British Constitution, that juries 'are, as it were, incorporated with our Constitution, being the most valuable part of it.' Jac. Law Dict. tit. 'Jury.'

"It was because the people thought the judges were poor judges of the facts that they committed their decisions to a jury. Undoubtedly juries sometimes err in deciding the facts but their errors are trifling in number and extent compared with the errors of the judges in deciding the law. The numerous appellate courts of the country are engaged principally in correcting their own and the errors of other courts on questions of law. The mistakes of juries take up very little space comparatively in the enormous volume of law reports with which the country is being deluged. In their deliberations upon the facts of the case they are at liberty to exercise their common sense and practical experience and knowledge of human affairs, untrammeled by the excessive subtilty, overrefinement, and the hair-splitting of the schoolmen which have crept into the administration of the law by the courts to such an extent as to sometimes bring it into reproach. It is not by such modes of reasoning that the soundness of a verdict of a jury is to be tested. It is not, therefore, any ground for disturbing the verdict of a jury that the court would not have rendered such a verdict. It must appear that all reasonable men would agree that it was not supported by the evidence, and should be annulled. The constitutional right of the citizen to have the facts of his case tried by a jury must not be encroached upon by the courts under any pretext. 'It is of the greatest consequence,' said Lord Hardwick, 'to the law of England, and to the subject, that these powers of the judge and jury be kept distinct; that the judge determine the law, and the jury the facts, and, if ever they seem to be confounded, it will prove the confusion and destruction of the law of England.' *Rex v. Poole*, Cas. t. Hardw. 28. 'It is of equal consequence to the laws of this country and its people that the separate powers of the judge and jury be sedulously maintained."

In the case of *Missouri, Kansas & Texas Railway Co. v. Farrington,* which was one wherein damages were sought for the kil-

ling of a cow, cited in 1 Ind. T. 646, 43 S. W. 946, Judge Townsend, after reciting that "the evidence of the plaintiff is that the train was 200 yards from the cow when she got upon the track, and that the evidence of the engineer is that she was about 90 feet from the engine, that she got off the track, and he thought she would remain off, but that she came back on the track when the engine was about 50 feet from her," and that the speed of the train was estimated to be from "10 miles per hour by defendant's witness to 40 miles per hour by plaintiff's witnesses," on passing on the question of negligence, and in holding that it was properly a question for the jury, says:

"The evidence we think properly went to the jury, and it is the province of the jury to say whether the circumstances are sufficient to warrant a finding that the cow was killed through the negligence of the railway company. The duty of railway companies to keep a lookout for stock on their tracks is no longer an open question. We think the charge of the court properly stated the law to the jury. The questions involved in this case are fully discussed in *Railway Co. v. Ellis*, 10 U. S. App. 640, 4 C. C. A. 454, 54 Fed. 481; *Railway Co. v. Washington*, 4 U. S. App. 121, 1 C. C. A. 286, 49 Fed. 347; *Railway Co. v. Elledge*, 4 U. S. App. 136, 1 C. C. A. 295, 49 Fed. 356; *Railway Co. v. Johnson*, 10 U. S. App. 629, 4 C. C. A. 447, 54 Fed. 447, and cases cited."

Under the authorities of the jurisdiction in which the case arose upon the duty of a railway company in reference to keeping a lookout for stock, the instruction: "The company is required to keep a lookout for stock, and, if they keep a proper lookout and are not able to discover it in time to stop their train, they are not responsible"—was not erroneous. *M., K. & T. Ry. Co. v. White*, 2 Ind. T. 23, 47 S. W. 351; *M., K. & T. Ry. Co. v. Farrington*, 1 Ind. T. 646, 43 S. W. 946; *Gulf, C. & S. F. Ry. Co. v. Washington*, 49 Fed. 347, 1 C. C. A. 286; *Gulf, C. & S. F. Ry. Co. v. Ellis*, 54 Fed. 481, 4 C. C. A. 454.

There appearing no error in the record, the judgment of the lower court is accordingly affirmed.

All the Justices concur.