## CITY OF SHAWNEE v. DRAKE.

No. 6643—Opinion Filed Jan. 29, 1918.

Rehearing Denied March 26, 1918.

(171 Pac. 727.)

1. **Negligence — Condition of Premises — Invitation.**

"One who goes upon the premises of another in a common interest or to a mutual advantage is there under the implied invitation of the owner." A., T. & S. F. R. R. Co. v. Cogswell, 23 Okla. 181, 99 Pac. 923, 20 L. R. A. (N. S.) 837.

2. **Municipal Corporations — Parks — Invitation.**

Where, according to a general plan for the improvements of a city street, a space left within its bounds between a portion paved for a roadway and the sidewalk is set apart as parking, primarily, at least, for ornamentation rather than travel, the maintenance thereof in a condition attractive and pleasing to the eye may be regarded as of common interest and mutual advantage to the city and abutting property owners; and where the city makes no provision to that end, but for a number of years the property owners mow the grass upon such

parking, an invitation so to do will be implied on the part of the city.

3. **Same.**

Such invitation, from its nature, cannot, in reason, be considered as restricted to the person of such an owner, but must be held to include his servant employed for the specific purpose.

4. **Same — Personal Injury — Invitation —Care Required.**

Where a city invites the use of its premises by one for a common interest and mutual advantage, it owes him the duty of exercising ordinary care to prevent his injury by keeping the premises in a condition reasonably safe for such use; and a breach of such duty constitutes actionable negligence.

5. **Same — Negligence— Question for Jury.**

Evidence examined, and held, that the trial court correctly refused to direct a verdict for defendant.

(Syllabus by Bleakmore, C.)

Error from District Court, Pottawatomie County: Chas. B. Wilson, Jr., Judge.

Action by Jordan Drake against the City of Shawnee. Judgment for plaintiff, and defendant brings error. Affirmed.

W. T. Williams, for plaintiff in error.

Blakeney & Maxey and Abernathy & Howell, for defendant in error.

Opinion by BLEAKMORE, C. This action seeking recovery for personal injuries was commenced in the court below by Jordan Drake against the city of Shawnee. Upon trial to a jury, plaintiff obtained verdict and judgment for $1,500, and defendant has appealed.

Some years before the occurrences involved the city of Shawnee had caused one of its streets to be improved by paving a portion thereof and the laying of sidewalks, leaving a space of some 15 feet or more between the pavement and the walks for a grass plot or parking. The city also operated and maintained a system of waterworks, and at points in the parking 4 or 5 feet from the outer edge of the sidewalk opposite their property had installed meters for the measuring of water supplied to consumers. These meters were affixed to service pipes situate some 18 inches or 2 feet underground, and were surrounded and protected by a meter box, which consisted of a joint of tiling 18 inches in diameter and about 30 inches in length, extending to the surface of the parking. In the upper end of the tiling was a groove, into which was seated a metallic lid covering the same. It appears that the abutting owners along

the street were accustomed to cut the grass on the parking in front of their lots.

On October 13, 1910, plaintiff was employed by one of such owners to mow the grass on the parking. In performing such service he stepped upon the lid covering a meter box, which was concealed from his sight by the grass, and by reason of the fact that such lid was not properly adjusted and fitted into the groove in the tiling made for that purpose, it turned with his weight and he fell with one foot and limb inside the tiling, and was injured. Within a few hours after his injury his employer examined the meter box and found that grass had grown over the rim of the tiling, and that dirt and dust had accumulated in the groove near the top thereof, into which the metal lid was designed to fit, to such an extent that the lid was thereby lifted or raised out of the groove. A portion of the testimony of this witness is as follows:

"A. I examined the meter to learn what had caused this accident, caused his fall, and found the tendrils or stems of the Bermuda had grown under the lid, so it wouldn't fit down in the flange made to retain it. Q. Now, in the flange you found that the tendrils of the grass had grown under into the place where the lid fit? A. It had either grown under or the lid had been placed down on them, they being long enough to reach under the lid. Q. Now, did you find any other substance in the flange or groove besides the grass? A. Well, dirt that would naturally accumulate from blowing. * * * A. I found the grass had grown under the rim, or the lid had been placed down on the stems. * * * Q. Now, did you notice how deep that flange was that holds the lid from being flush to the top? A. I didn't notice it at the time, but from my general knowledge, I am quite familiar with these, it is about from one-eighth to one-quarter of an inch deep. Q. And the runners of the grass had grown under there until it lifted the lid or raised the lid out of the groove? A. Yes, sir. Q. So it would slip? A. I can't say whether they had grown in there, or whether they were there when the lid was placed on. Q. There was grass enough on there to raise it from its place? A. Yes, sir. Q. You said something about dirt getting in there from the wind. State to the jury what you mean by that. A. We know this is a dusty country; whenever the wind blows, any grooves or exposed places that way will fill up with dust and become solid; that was the case of the rims I examined, mine and the one where Mr. Drake got hurt; they were within 3 feet of each other. Q. The dirt in there was enough to fill the groove in which the lid fit? A. Partially, yes, sir."

It also appears that the water meters were read regularly each month, and that in order to read the same it was necessary to remove the metal covers from the tiling. The last reading of the particular meter located in the box into which plaintiff fell was on September 24, 1910, and the city employe who performed this service testified that after reading such meter he replaced the metal lid, so that it fit within the groove. His exact testimony in this regard is as follows:

"Q. I will ask you to tell the jury what was the condition of the groove there at that meter the last time you read it. A. Well, there was some grass around it. I never paid much attention. Q. When you went there, what did you do with reference to the grass? A. I kind of pulled it back, and some grass growing up over it around the edges a little. Q. Tell the jury what you did with that. A. I pulled the grass up, so I could get at it. Q. Do you mean to pull it up, or pull it out, or break it off? A. Pulled it off; yes, sir. Q. After you pulled it off, what did you do with it? A. Threw it off to one side. Q. I want you to tell the jury whether or not, when you replaced the lid at this time on the 24th day of September, you left grass in the groove there and placed the lid on top of it. A. No, sir. Q. Do you remember anything about the condition of this meter box at that time? A. No; only just like the rest of them. Q. Do you remember anything—you have no recollection or paid no particular attention to any part of it except putting the lid off and replacing it? A. Yes, sir. Q. At the time you read this meter on the 24th day of September, 1910, read this meter there, can you tell the jury what was the height and condition of the grass growing around that meter box? A. No, sir; I can't tell how high it was. Q. You didn't pay any attention? A. No, sir. Q. I will ask you to state whether or not, when you went there, you found any grass or runners of the grass growing between the lid or under the lid next to the rim. A. No, sir; I did not. Q. I will ask you to tell the jury whether or not, at the time you read this meter, you found that meter filled with dirt of any description. A. No, sir."

At the close of the evidence the court refused the request of defendant to direct a verdict in its favor. In the petition it is alleged:

"That the city of Shawnee, through its water department and officers in charge of said department, would at the end of each month read the said meters, which belonged to them, and after they had read the same would, instead of closing the said meter lid, as above described, negligently

and carelessly fail to fit the same into the groove. so that it would be solid and stationary," etc.

The principal question presented for our consideration is whether the trial court erred in refusing to direct a verdict for defendant. It is contended that plaintiff was at most a licensee, to whom defendant owed no duty to keep the parking in a reasonably safe condition, but was only required to refrain from willfully or wantonly injuring him. We do not concur in this view, but are of opinion that plaintiff was an invitee rightfully upon the parking at the time of his injury, at the implied invitation of the city. It is unnecessary to consider whether a space within the bounds of a street, between the portion paved for a roadway and the sidewalks, set apart for parking, is a part of the street, for neglect of the reasonably safe condition of which a city may be held liable to one using the same for usual purposes of travel, as that question is not directly presented. In the instant case, however, the very plan of the street in question imports a dedication of the parking, primarily, at least, for ornamentation rather than travel. Indeed, in its brief defendant states:

"The city had withdrawn that part of Broadway street where this meter box was located from public use for ordinary travel, and had dedicated it to parking purposes, to beautify the street and adjoining premises."

Obviously the maintenance of such parking in a condition attractive and pleasing to the eye must be regarded as of common interest and mutual advantage to the city and abutting property owners. So far as the record discloses, the city made no provision to this end; but some of the lot owners, for a number of years prior to plaintiff's injury, had at least cut the grass on the space in front of their properties, and to this extent, with the knowledge and consent of the city, effectuated the purpose for which the parking was intended. From all the circumstances of the case it may be naturally and reasonably inferred that the city impliedly invited the lot owners along this street to care for the parking, and that it was in response to this implied invitation that plaintiff was employed for such purpose by an abutting owner at the time of his injury.

"One who goes upon the premises of another in a common interest or to a mutual advantage is there under the implied invitation of the owner. The test as to whether there is an implied invitation is stated by Mr. Campbell in his treatise on Negligence in the following language: 'The principle appears to be that invitation is inferred where there is a common interest or mutual advantage, while a licensee is inferred where the object is the mere pleasure or benefit of the person using it.'" A., T. & S. F. Ry. Co. v. Cogswell, 23 Okla. 181, 99 Pac. 923, 20 L. R. A. (N. S.) 837.

The rule is also quoted with approval by this court in A., T. & S. F. Ry. Co. v. Jandera, 24 Okla. 106, 104 Pac. 339, 24 L. R. A. (N. S.) 535, 20 Ann. Cas. 316, and English v. Thomas, 48 Okla 247, 149 Pac. 906, L. R. A. 1916F, 1110.

"The word 'invitation. used in the rule, covers and includes in its enticement, allurement, and inducement, if the case in judgment holds such features. Also, the invitation may be implied by a dedication, or it may arise from known customary use. Drennan v. Grady, 167 Mass. 415, 45 N. E. 741, and cases, supra. So, too, it is held in all the cases that the invitation may be implied by any state of facts upon which it naturally and reasonably arises." Glaser v. Rothschild, 106 Mo. App. 418, 80 S. W. 332; Id., 221 Mo. 180, 120 S. W. 1, 22 L. R. A. (N. S.) 1045, 17 Ann. Cas. 576.

The implied invitation to the lot owner to go upon the parking in front of his premises for the purpose of cutting the grass thereon, from its very nature, cannot in reason be regarded as restricted to the person of such owner, but under the circumstance must be held to include his servant employed for that particular purpose. The application of this principle under circumstances somewhat analogous is found in English v. Thomas, supra, wherein it was held:

"Where the owner of an office building rents the rooms to numerous tenants, mostly lawyers, a majority of whom were under contract with plaintiff to deliver the Muskogee Daily Phoenix to their offices, and in compliance with such contracts of subscription such papers were by plaintiff delivered, held: (a) That under the circumstances of this case, plaintiff was on the premises at the express invitation of the tenants, and for their common interest and mutual advantage, benefit, and convenience. (b) That, while upon the premises under such invitation, the owner owed the invitee precisely the same duty that he owed to his tenants."

In Pauckner v. Wakem, 231 Ill. 276, 83 N. E. 202, 14 L. R. A. (N. S.) 1118, it is held:

"A warehouseman must use reasonable care for the safety of one who goes into the warehouse to get property of his employer stored there, since such a person is more than a mere licensee, being there on

the implied invitation, of the warehouse-man, and about his business."

In the body of the opinion it is said:

"Appellants had the goods of the Chicago Tribune Company stored in the warehouse. It must have been within the contemplation of appellants, when these goods were received into their warehouse, that sooner or later a delivery of them would have to be made to the owner of the goods. The delivery of the goods by appellants and the receipt thereof by the Chicago Tribune Company was a matter of business, which was of mutual interest to the parties. The duty of appellants to the servant of their customer was the same as to the customer himself. When appellee and Carpenter went to appellants' warehouse for the purpose of removing the goods of the Chicago-Tribune Company, the appellants owed these servants the same duty that would have been due to the president or general manager of the Chicago Tribune Company, had he called in person for the goods."

In Samuelson v. Mining Co., 49 Mich. 164, 13 N. W. 499, 43 Am. Rep. 456, the following language is used by Judge Cooley:

"If the mine were in an unsafe condition when it was handed over to the contractors, and this was known to the defendant, or by the exercise of proper care ought to have been known, and if in consequence a miner, who was brought there in ignorance of the danger, was killed, the defendant should be held responsible. Every man who expressly or by implication, invites others to come upon his premises, assumes to all who accept the invitation the duty to warn them of any danger in coming which he knows of or ought to know of and of which they are unaware. This is a very just and very familiar principle."

Implied invitation is a part of the law of negligence by which an obligation to use reasonable care arises from the conduct of the parties. Its essence is that the defendant knew or ought to have known that something that he was doing or permitting to be done might give rise in an ordinarily discerning mind to a natural belief that he intended that to be done which his conduct had led the plaintiff to believe that he intended. It is not enough that the user believed that the use was intended. He must bring his belief home to the owner by pointing to some act or conduct of his that afforded a reasonable basis for such belief.

Defendant, having invited the use of its premises by plaintiff for purposes of common interest and mutual advantage, owed to him the duty of exercising ordinary care to prevent his injury by keeping the premises in a condition reasonably safe for such a use; and a breach of such duty would constitute actionable negligence. Clearly there is some evidence from which the jury might reasonably have inferred that defendant neglected to replace the lid on the meter box in the groove as it was designed to fit, thus rendering it unsafe under the circumstances of the case.

"It is well settled that what is or what is not negligence in a particular case ordinarily is a question for the jury, and not for the court. Missouri, K. & T. R. Co. v. Shepherd, 20 Okla. 626, 95 Pac. 243; Harris v. Missouri, K & T. R. Co., 24 Okla. 341, 103 Pac. 758, 24 L. R. A. (N. S.) 858; Dewey Portland Cement Co. v. Blunt, 38 Okla. 182, 132 Pac. 659; Gulf, C. & S. F. R. Co. v. Ellis, 54 Fed. 481, 4 C. C. A. 454. When the standard of duty is not fixed, but variable, and shifts with the circumstances of the case, it is in its very nature incapable of being determined as a matter of law, and, where there is sufficient evidence, must be submitted to the jury to determine what it is, and whether it has been complied with. O'Neil v. East Windsor, 63 Conn. 150, 27 Atl. 237; McCully v. Clarke, 40 Pa. 406, 80 Am. Dec. 584; Baker v. Westmoreland & C. Nat. Gas Co., 157 Pa. 593, 27 Atl. 789." Littlejohn v. Midland Valley R. Co., 47 Okla. 204, 148 Pac. 120.

We are of opinion that the trial court properly submitted the cause to the jury. The petition sufficiently stated a cause of action. The instructions given by the court fairly state the law applicable to the case, and there was no error in refusing those requested by defendant.

An examination of the entire record convinces us that substantial justice has been done between the parties, and the judgment should be affirmed.

By the Court It is so ordered.