**CHICAGO, R. I. & P. R. CO. v. VAIL.**

No. 10434—Opinion Filed Nov. 1, 1921.

(Syllabus.)

**1. Carriers—Action by Shipper for Failure to Furnish Cars—Form of Action.**

The form of the action for damages for failure of a carrier to furnish cars to a shipper of livestock is not important. The ground of the liability is unjustifiable omission to furnish the cars, and it is not material that, in an action for damages for failure to furnish cars requested for a particular day, the shipper predicates liability on breach of contract to furnish cars on that day.

**2. Same—Verdict—Sufficiency of Evidence.**

The evidence examined, and held to warrant the jury in finding that there was an agreement between the shipper and the local agent of the carrier to furnish cars to the shipper for a particular day, and that such agreement was negligently treated, and that the carrier was not excused from complying with the same, and that the shipper was damaged as a result of the carrier's failure to comply with such agreement.

Error from District Court, Oklahoma County; John W. Hayson, Judge.

Action by O. P. Vail against the Chicago, Rock Island & Pacific Railway Company for damages for failure to furnish cars. Judgment for plaintiff, and defendant brings error. Affirmed.

C. O. Blake, Roy St. Lewis, W. R. Bleakmore, and R. A. Tolbert, for plaintiff in error.

Walter & Hilpirt, for defendant in error.

JOHNSON, J. The defendant in error herein, plaintiff below, brought an action in the district court of Oklahoma county, Oklahoma, December 8, 1917, against the Chicago, Rock Island & Pacific Railway Company, praying for damages in the sum of $526.52, for failing to furnish cars as requested, in order to ship hogs and cattle from Apache, Oklahoma, to Oklahoma City, Oklahoma, November 5, 1917.

The petition in said cause, omitting the formal parts, is as follows:

"Plaintiff states that all times hereinafter mentioned the Chicago, Rock Island & Pacific Railway Company, the defendant named above, was and is a corporation, duly organized and authorized under the laws of the state of Oklahoma, as a common carrier for hire and as such engaged in the transportation of livestock between and beyond the points mentioned.

"That on the 28th day of October, 1917, he ordered three cars in the usual manner, from the local freight agent of the defendant, at Apache, Oklahoma, for the shipment of cattle and hogs from Apache, Oklahoma, to Oklahoma City, Oklahoma, and to be loaded out on the 30th. That on the 29th of October, the agent told him that he could not load before the 31st; that on the 30th the agent said he would have no cars for the 31st, but promised and agreed to furnish him the three cars for November 2nd. No cars were furnished on this date; that after various other statements, that plaintiff could load out on November 3rd, the agent said he would have a train of cars for the plaintiff for Sunday, November the 4th; that on the 4th of November the agent promised and agreed again to have three cars ready for the plaintiff to ship Monday, No-

vember the 5th, and that acting and relying on the promise of said agent to furnish said cars, he delivered to the defendants at Apache, Oklahoma, 2 car loads of hogs, consisting of 221 head, and 1 car load of cattle, consisting of 36 head of cattle, all in good order and condition and of which he was the owner, for transportation and delivery for the market and immediate sale at Oklahoma City, Oklahoma, and consigned to the C. M. Keys Commission Company at the National Stock Yards. That the same were to be transported and delivered in the usual and ordinary time and manner and that the defendants so received the same.

"That it was within the power and province of said defendants to have furnished said cars within the time as agreed by their agent as aforesaid, but that on the contrary said defendants and their agent delayed said shipment and wholly and wrongfully failed, refused and neglected to furnish said cars even after the delivery of the livestock to their line for some four days and did not deliver the same to Oklahoma City until the 9th day of November, 1917.

"That for reasons aforesaid, in failing to furnish said cars as aforesaid, and in delaying said shipment for such unusual and extraordinary time the plaintiff was and is actually damaged to said hogs and cattle in the sum of five hundred twenty-six and 52/100 ($526.52) dollars.

"That the usual and ordinary time and a reasonable time for said shipment to have been delivered had the cars been furnished was 12 hours.

"Wherefore, plaintiff prays judgment against said defendant, in damages in the sum of $526.52, six per cent. interest on said amount from Nov. 5th, 1917, his costs of this action and any further relief to which he may be entitled under the law."

The defendant answered by general denial, and by admitting the corporate capacity of the defendant and that it was on the date mentioned engaged in the business of common carrier.

The cause was tried to the court and jury on the 28th day of May, 1918, and resulted in a verdict and judgment in the sum of $526.52, the amount sued for by the plaintiff.

The defendant filed timely motion for a new trial, alleging the usual statutory grounds, which was overruled by the court and exceptions saved, to reverse which aforesaid judgment this proceeding in error was commenced.

Petition in error assigns as error the overruling of the defendant's motion for a new trial, which, among other grounds, includes as error the overruling by the trial court, at the close of the evidence, of the defendant's motion for a directed verdict, and the trial court's overruling the objection of the defendant to instruction No. 4, which submits a state of facts not supported by the evidence. It is desired to present these matters under five fundamental specifications:

(1) No contract or promise to furnish cars.

(2) Failure to supply cars.

(3) Corporation Commission orders as laws.

(4) Revised Laws of Oklahoma 1910, sec. 788, to be followed.

(5) Court erred in giving instruction No. 4.

These propositions are related, and will be considered together.

The plaintiff alleged in his petition that on the 4th day of November, 1917, the agent of the defendant promised and agreed to have three cars ready for the plaintiff to ship Monday, November 5th, and that, acting and relying on the promise of the said agent to furnish said cars, he delivered to the defendant at Apache, Oklahoma, two carloads of hogs, consisting of 221 head, and one carload of cattle, consisting of 36 head of cattle, all in good order and condition, and of all of which he was the owner, for transportation and delivery for the market and immediate sale at Oklahoma City, Oklahoma, and consigned to the C. M. Keys Commission Company at the National Stock Yards; that the same were to be transported and delivered in the usual and ordinary time and manner, and that the defendant so received the same; that it was within the power and province of said defendant to have furnished said cars within the time as agreed by its agent as aforesaid, but that, on the contrary, the said defendant and its agent delayed the said shipment and wholly and wrongfully failed, refused, and neglected to furnish said cars after the delivery of the live stock to their line for some four days, and did not deliver the same at Oklahoma City, Oklahoma, until on the 9th day of November, 1917; that the usual and ordinary time and a reasonable time for said shipment to have been delivered, had the cars been furnished, was 12 hours, and that in failing to furnish said cars and in delaying said shipment for such unusual and extraordinary time, the plaintiff's actual damage to said hogs and cattle was the sum of $526.52.

The testimony of the plaintiff was not disputed and he testified that he had ordered these cars several times, as alleged in his petition, over the telephone from his residence seven or eight miles in the country from Apache, Oklahoma, and on Sunday morning, November 4th, the agent promised and agreed again to have three cars ready for the plaintiff to ship Monday, November 5th; and testified that he told him, the agent, that he, the plaintiff, would be ready to ship by 10 o'clock, Monday, without fail, and the agent replied that he would have a stock special that day, and would have cars for plaintiff's shipment; "that Sunday evening about 5 o'clock the agent called me and said that he had a few cars and wanted to know how many I could possibly get along with, as few as I could, and I told him, and he said all right, that he would have me cars; and I had my cattle out home and he said that he had to move some other stuff, so I went ahead and notified the people to get my stuff ready, and that I would be ready to ship the stuff on Monday by ten o'clock, and on Monday at ten o'clock, I had all the stock there."

The plaintiff testified on cross-examination as follows:

"Q. And you say you were disappointed because you could not get the cars? A. Yes, sir. Q. And you were in Apache practically all day Monday, Wednesday, and Thursday? A. Yes, trying to get the cars. Q. And it was your impression that you could get the cars when you ordered them? A. Yes, for I had telephoned in and told them and they had advised me that I could get the cars, and that was all that I wanted to know, and I got my stuff all ready to ship, and then they informed me that they had sent the cars out and I would have to wait for some cars. Q. You had ordered the cars over the telephone? A. Yes, sir. Q. You did not send in written application or demand for the cars? A. No, I did not. Q. Just had a telephone conversation with the agent or cashier? A. I had a conversation with the agent on Friday, before the train left on Sunday. Mr. Jeffery didn't want any written order, it was all right. I have always just ordered the cars from him this way, and he had promised me some cars on Friday. Q. And it was your understanding that you would get the cars from Mr. Jeffery? A. Yes; and then when he said that he did not have the cars he telephoned to me, and that was when he found that he could not provide the cars as promised. Q. And did you tell him to get the cars for you as soon as possible, you still wanted them? A. Yes, of course: I was anxious to get my stuff shipped. Q. And you say that you had your stock there in

the pens to be shipped Monday? A. Yes: by ten o'clock that morning and they never left until Wednesday and did not arrive in Oklahoma City until the 9th."

The defendant's agent at Apache did not deny this testimony of the plaintiff further than to say that he did not remember all that was said.

The plaintiff further testified that he had lived at his present location west of Apache and been engaged in farming and shipping stock for seven or eight years, making shipments during the last five or six years on an average of six shipments a month, and during that time, the testimony showed, Mr. Jeffery had been agent of the defendant at Apache, and that the plaintiff ordered cars for his shipments of live stock by telephone and that the agent or defendant's cashier would make a memorandum of the orders for cars on the blanks of the company, giving them a serial number, and that the number for this shipment was 25, and was made in the first conversation over the 'phone on October 28th.

Mr. Jeffery, the agent, testified concerning this order as follows:

"Cross-Examination.

"Q. I believe you said, Mr. Jeffery, the first conversation you had with Vail about the cars in this particular shipment was October 28th? A. Cashier. He phoned the order to the cashier. Q. For how many cars? A. Three cars. Q. And your custom is to make a written memorandum of those orders? To the best of your recollection, what was that order? A. Two cars for hogs and one for cattle. Q. And for what day? A. For the 31st. Q. And what word did you give him on this order? A. I was not talking with him. The cashier received the order. Q. What answer was given him on this order of October 28th as to your ability to furnish cars for Nov. 2nd? A. That we did not know whether we could furnish the cars or not, and not to bring the stock in until we found out whether we could get the cars. Q. Is it the usual custom here to order cars by written order or by 'phone? A. By 'phone. Q. How long have you been acquainted with Mr. Vail? A. About 13 or 12 years. Q. He has shipped other stock during that period other than this shipment? A. Yes, sir. Q. Can you give a reasonable estimate of about how much? A. The past three or four years, probably averaged four or five cars per month. Q. Do you remember what day of the week November the 2nd was on? A. November 2nd was Friday. Q. When did you next hear from Mr. Vail in regard to ordering cars for this shipment? A. The next I remember of was on Friday afternoon. * * * Q. Between November 2nd and November 8th. did you have any stock cars at the station from November 2nd to November 8th? A. Yes, sir. Q. How many? A. Six. Q. At what time, those cars after November

2nd, or any part of them? A. The evening of November 4th. Q. Did you notify Mr. Vail that these cars were here? A. No, sir. Q. You had no conversation with him regarding these six cars? A. Not these six that I remember of. Q. When did you next hear from him after November 2nd, in regard to this shipment? A. On November 4th, I called him up and told him that we were going to run a stock extra that day and could handle all the stock that was ready. Q What did he say? A. He said it was impossible for him to get this stock in on such short notice and would have three cars ready to ship Monday. Q. And what did you say in response to that? A. I do not remember. Q. Do you remember whether you said 'all right' or not? A. No, sir. Q. Do you remember whether you said anything? A. No, sir; I don't. Q. When did you next hear from Mr. Vail? A. I talked to him some time Sunday evening. Q. What did you say? A. That was Sunday evening. I don't remember. A. Well, do you remember whether the conversation was anything about the cars or not? A. Yes, sir; it was about the cars. Q. Do you remember whether he said he would have his stock in Monday, the next day? A. No, sir. Q. This conversation was over the 'phone also? A. Yes, sir Q. Do you remember whether Mr. Vail said he would order the stock sent in, or words to that effect? A. No, sir. Q. Do you remember whether he said that he would have four cars of stuff, but that he would leave one car at home and bring three? A. No, sir. Q. After the Sunday evening conversation, when did you next hear from or see Mr. Vail? A. On Monday, about noon, I think. Q. And where was that? A. I think he came to the depot to see about the cars. Q. Do you know whether or not you had his cars here? A. I think so. Q. And what did you tell him? A. Had no cars. Q. What reason, if any, did you give for not having any? A. Did not give him any. * * *Q. What became of the six cars that you had on hand on Sunday evening? A. They were loaded that night. Q. By what parties? A. I cannot recall their names. I can look it up. Q. I wish you would please look at your records and get those names. A. W. T. Sparks, one car for Wichita. C. J. Laughlin, one car. Oklahoma City, November 4th. Mays and Burns, one car, Oklahoma City, November 4th Clyde Meriman, three cars. Oklahoma City, November 4th. Q. About what time of the day was the Sparks car loaded? A. 11:45 p. m. Q. And the Laughlin car? A. 11:45 p.m. Q. And the Mays and Burns car? A. 11:45 p. m. A. Clyde Merriman's three cars? A. 11:50 p. m. Q. A part of these cars were cars intended for Mr. Vail's shipment, were they not? A. These were brought in on the order of the stock extra that day, but I did not pay any attention to their orders because we had orders to get them in—would handle all the stock. Q. Where did you get these orders from? A. From the dispatcher's office at El Reno. Q. Then your instructions that day were to disregard these numerically numbered orders? A. They did not tell me about that, but I did. Q. You nave testified that Mr. Vail's order was number 25? A. Yes, sir. Q. In relation to that number, what were the numbers of the orders of Sparks, Laughlin, Mays and Burns and Clyde Merriman? A. Laughlin's order was 26. Mays and Burns and Sparks, they did not have any orders of their own. They bought the cattle and were on order No. 23, by H. L. Johnson and C. B. Thompson, No. 23, and No. 26. * * * Q. What did Mr. Vail do, if you know, with his cattle, after their arrival prior to the time they were shipped out on November 8th? A. He fed and took care of them. Fed and watered them. Q. Did he hold them here at the stock yards? A. Yes, sir. Q. Was he here personally taking care of them? A. Yes, I think he was here every day. Q. Exhibit No. 2 (dated Apache, 11/23, 9:25 a. m.) your telegram to the dispatcher at El Reno in which you say: 'Will have 1 hogs and two cattle for stock special today. O. P. Vail advises impossible to get his stock here on so short notice, but will have three stock in pens by noon tomorrow and ready to load.' Did you send that telegram? A. Yes, sir. Q. Did you receive a response to it? A. No, sir. Q. Did you notify Mr. Vail that you were doing this? A. No, sir. Q. Did you tell him anything about any orders that you had from your superiors that he would not be able to get these cars he had ordered for Sunday, as you say, for the following Monday morning? A. No, sir. Q. In Exhibit No. 3. which purports to be a telegram from the dispatcher to yourself, dated El Reno, November 6, 8:50 p. m., which says: 'Ordering your 5 stk cars on 761 in a. m. See shippers load promptly. Advise if cannot use at once so car take to points where badly needed.' You say you received that telegram at that time? A. Yes. sir. Q. Was tha' before or after Mr. Vail had his stock here in the pens? A. That was after. Q. Was he ready to load at that time? A. Yes, sir."

The plaintiff testified as to the expense incurred by him for feed for the stock while in the pens at Apache, and as to the shrinkage in weights of the stock, showing that the same were weighed at Apache, and also when sold in Oklahoma City, and as to the price the same were sold for, leaving it an easy matter for the jury to figure and cast up the amount of damage. However, it is not claimed that the award of the jury was excessive in case the defendant was at all liable.

The defendant's defense was upon the theory that there was no liability of the defendant shown; that no contract to furnish cars was proven, and no negligence or delay in furnishing cars was proven. The defendant offered quite a mass of testimony going to the question of a general shortage of cars throughout the country during the year 1917.

and the demands made upon the defendant for cars by the government of the United States, and its effort to comply with such demands, and urging, therefore, that under the circumstances of this case the defendant was not negligent; also orders of the Corporation Commission of this state defining what was a reasonable time in which to furnish cars, and arguing that, disregarding the manner in which the plaintiff ordered the cars, the testimony of both parties is that the cars were placed within the time fixed by the Corporation Commission.

We cannot agree with defendant's contention thus made, that the same constituted a defense to the plaintiff's cause of action in the circumstances shown by the record. Had the defendant company stood upon its rights in the circumstances shown by its testimony and declined to agree to furnish cars except on a written order made therefor by the shipper, and at an earlier date than that fixed by order of the Corporation Commission defining a reasonable time, quite a different situation would have been presented, and doubtless this suit would not have been here for determination by this court. It is apparent from the record hereinbefore recited that the plaintiff's cause of action is based upon an agreement of the defendant's agent made in the customary way, he making such agreement to furnish a definite number of cars at a specified time, charging a failure of the defendant to comply with such agreement, and that the plaintiff suffered detriment on account of such breach. We think the testimony was amply sufficient to take the question of the alleged breach of the agreement to the jury, and was also sufficient to support the findings of the jury as to the amount of damages that the plaintiff suffered as a result of the breach of such agreement by the defendant. Therefore the defendant's demurrer to the evidence was properly overruled by the trial court.

The defendant complains of the 4th paragraph of the court's instructions to the jury. We have carefully examined the instructions, and find that the same show a fair and reasonable statement of the law applicable to the facts of this case, and that this contention of the defendant is without merit.

It has been the universal holding of this court that where there is any testimony reasonably tending to support the verdict of the jury, in such circumstances the same will not be disturbed by this court on appeal. Armstrong, etc., Co. v. Crump, 25 Okla. 452, 106 Pac. 855; McKennon v. Pentecost, 8 Okla. 117, 56 Pac. 958; Missouri, K. & T. Ry. Co. v.

Shepherd, 20 Okla. 626, 95 Pac. 244; Choctaw, O. & G. Ry. Co. v. Burgess, 21 Okla. 653, 97 Pac. 271; Great Western Mfg. Co. v. Davidson M. & E. Co., 26 Okla. 626, 110 Pac. 1096; McCoy v. Wosika, 75 Okla. 3. 180 Pac. 967.

The judgment of the trial court is affirmed.

HARRISON, C. J., and KANE, MILLER, and KENNAMER, JJ., concur.