### SHELL PETROLEUM CORPORATION et al. v. PERRIN.

No. 26267. Sept. 15, 1936.

Rehearing Denied Dec. 22, 1936.

Application for Leave to File Second Petition for Rehearing Denied Feb. 2, 1937.

Hudson & Hudson and R. B. Lewis, for plaintiffs in error.

N. B. Day and Roy F. Ford, for defendant in error.

PHELPS, J. The plaintiff recovered a verdict and judgment of $25,000 for injuries received in a collision with the defendant's truck, and the defendant appeals.

The plaintiff's father and mother were riding in the front seat of an automobile, the father driving. Plaintiff, a girl four years of age, was in the rear seat alone. They were traveling a much used paved highway from Tulsa to Dawson, Okla. At the scene of the accident outside of the city limits, the highway runs in a northeasterly direction, and is crossed by a section line road running due east and west, called Pine street, so called because it is the same road which becomes Pine street when it enters the city limits.

The defendant's large gasoline truck, being driven by defendant's servant, and with another employee of the defendant stationed on the rear thereof, was proceeding along the paved highway in said northeasterly direction, and the car in which plaintiff was riding was proceeding along the same highway in the same direction, a short distance behind the truck. They had not yet reached the intersection. On approaching the intersection the truck was slowed down to about ten miles per hour, in order that the driver of the truck could turn on to Pine street. The driver of the automobile slackened its speed accordingly and remained a short distance behind the truck, and somewhat to the left thereof.

At this point it becomes important to get a clear picture of the intersection. It was not the ordinary intersection which is made by two streets crossing each other at right angles. Due to the fact that the highway, on which the parties were driving, ran in a northeasterly and southwesterly direction, and that Pine street lay due east and west, the turn from the paved highway on to Pine street so as to proceed west on Pine street was much greater than the customary turn to the left, being what is sometimes described as a "hairpin" turn. On the other hand, should the driver desire to go east on Pine street he would be required to make only a slight turn.

At a point about 30 feet before reaching the intersection the driver of defendant's truck gradually drove it off the paved portion, and to the right, as if he were about to proceed to the east on Pine street. But instead of turning in that direction it seems that the real purpose of his leaving the pavement and moving to the right thereof was to obtain plenty of room for the sharp turn back onto Pine street so as to proceed to the left and west along that street. The driver testified that he saw the car behind him and that he held out his hand when he was south of the intersection, but did not indicate by his testimony in what position he held the hand. The plaintiff's witnesses testified that the driver made no signal at all, and did not thrust out his arm or hand. Evidently the jury believed the plaintiff's witnesses on this question.

Both the truck and the car in the rear thereof were traveling very slowly. As stated above, the automobile was not traveling exactly behind the truck, but was slightly to the left. When the truck driver, having first turned off the pavement to his right, suddenly switched his truck back to his left across the pavement, and the driver of the automobile perceived the maneuver, the latter driver also turned his car accordingly to the left to avoid the collision. Nevertheless the truck and the car collided, near the left edge of the highway. Due to the slow speed of both vehicles, neither of them was turned over, but the jar of the collision broke a window glass in the car in which plaintiff was riding, and the flying glass cut several severe gashes in her face and head, resulting in permanent disfigurement. It also cut one eye so badly that the eye had to be removed.

The defendant in appealing first complains of the following instruction:

"You are instructed that the driver of an automotive vehicle who expects to make a left-hand turn across the road, if he has knowledge of a vehicle following him, is required to give a signal of his intention to make a left-hand turn before he attempts to make such turn. Failure to do so is negli-

gence on the part of the driver, and if injury proximately results therefrom, such defendant is liable."

The point urged by the defendant is that, since our statutes do not require the giving of the signal, the effect of this instruction was to take from the jury the determination of whether the failure to give it was negligence under the circumstances. Defendant argues that thus the court invaded the province of the jury, by announcing as a matter of law that the failure to give the signal, if there was such failure, amounted to negligence.

Our statutory rules of the road do not yet require the driver of the forward vehicle to signal his intention of turning to the left onto an intersecting road. Therefore this instruction, viewed as an abstract statement of the law, was possibly incorrect, since negligence is ordinarily a question of fact to be passed upon by the jury, under proper instructions. Nevertheless, it is equally well settled that, even though an instruction is erroneous in its abstract statement of the law, it will not cause a reversal of the judgment if, as applied to the facts of the particular case, no harm is seen to have resulted therefrom. We think this is that kind of case. The situation here is doubly peculiar, in that the nature of the intersection and the conduct of the forward driver were such as are not often encountered. It should be emphasized at this point that it is not intended by this decision to announce that the instruction would be proper in the average case. That point is not decided. We think, however, that when the nature of the intersection and the situation and movements of the parties are properly visualized, it will be apparent that the judgment should not be reversed for this error, in this particular case.

It is true that where the facts bearing on a material issue are disputed or where there is room for a reasonable difference of opinion as to the proper inference from the known facts, the issue is for the jury. Yet it is equally true that where the evidence permits but one reasonable conclusion, from an admitted or determined fact, the question may be decided by the court as one of law. M., K. & T. Ry. Co. v. Sheperd, 20 Okla. 626, 95 P. 243; Pine Belt Lbr. Co. v. Riggs, 80 Okla. 28, 193 P. 990; Harris v. M., K. & T. Ry. Co., 24 Okla. 341, 103 P. 758; Mean v. Callison, 28 Okla. 737, 116 P. 195; Neeley v. Southwestern Cotton Seed Oil Co., 13 Okla. 356, 75 P. 537.

If intelligent and reasonable men would not differ as to the inference or conclusion to be drawn from the facts, once they are determined to be the facts, it is not error for the court to withdraw from the jury the particular issue involved. Applying that principle to the question involved here, and to the peculiar facts of this particular case, there can be no doubt in our opinion whether reasonable men would differ on the question. It is not disputed, but on the other hand it is admitted, that the driver of the forward vehicle knew of the presence of the vehicle in the rear. It is admitted that the driver of the forward vehicle turned off the right of way to his right, before reaching the actual intersection, as if to make the slight turn in order to proceed eastward on Pine street. It is abundantly established by the evidence that he did not pursue the course which his actions indicated, but, on the contrary, whipped his truck suddenly to his left rear in order to make the hairpin turn necessary to travel in a westerly direction along Pine street. Even if it be conceded that reasonable men would differ as to whether the average driver in the normal case would signal his intention to make a left turn, they would not differ as to whether a prudent driver of the forward truck, under the circumstances of this case, would fail to signal the rear driver, whom he knew to be there, of such sudden and unexpected maneuver. It is too much to ask us to believe that any prudent driver, or that any reasonable mind would believe that any prudent driver, knowing that the rear car was following him in close proximity, would be guilty of such gross misconduct as not to warn that rear driver of his intention to run squarely into him, which is just what it amounted to. There was no way for the driver of the rear car to escape. He had, no doubt, been led into the belief that the truck was going to make the easy quarter turn to the right. Everything so indicated. Would a prudent driver, knowing of the presence of the following car, and under the particular circumstances here shown to have existed, turn back without warning and do the exact opposite of what his actions and failure of signaling indicated he was going to do? Certainly not, and it cannot be contended that reasonable men would differ in their answer to this question, under the circumstances of this particular case.

The instruction, in connection with the other instructions, permitted the jury to determine whether the signal had been made. By its own terms the instruction was not to be applied unless the jury should also find that the signal was not made. By its own terms, also, the instruction was to be applied only if the jury should find that the truck driver knew of the presence of the vehicle in rear. In this respect, however, it

is important to remember that the truck driver admitted knowledge of the vehicle in rear. This fact distinguishes the case from Smith v. Clark, 125 Okla. 18, 256 P. 36. A further distinction between the cases is that in Smith v. Clark the rear car attempted to pass the leading vehicle, while such is not the fact here. Still further possible distinctions are that a right angle intersection was involved in Smith v. Clark, and no apparent misleading, by first turning off the highway to the right, was involved in that case.

Though it is not necessary for us to go so far as the authorities hereinafter cited, it is entirely pertinent to observe that this state is far more liberal with the driver of the forward car, and the duties imposed upon him upon making a left-hand turn, than are most other states. Other jurisdictions have recognized the fact that entirely aside from statute, and regardless of whether a statutory rule of the road exists requiring the giving of a signal before making a left-hand turn, the custom of so doing, when turning from the right-hand side of the roadway, on well-traveled highways, has become such a universal custom over the entire United States, and is so recognized and relied upon, that the duty is positively imposed as a matter of law upon the forward driver to make such signal. Through long-continued use and practice certain fundamental and common sense rules have grown up by custom and have become crystallized into what has been designated the law of the road. A great body of common-law decisions has resulted therefrom. Volume 1 of Blashfield's Cyc. of Automobile Law, p. 539, states it in this manner:

"* * * Regardless of statute, the necessity for the driver of a motor vehicle before turning to the left to signal such intention, particularly to any vehicle close behind, is so great, and the practice is so universal and so relied upon, that the driver of a turning vehicle, who fails to signal without making certain that there is no one behind him, must be deemed negligent as to any vehicle in the rear with which he may come into collision in making his turning movement."

And Huddy says (Automobile Law, 9th Ed., vol. 3-4, p. 218):

"Even in the absence of statute, the driver of an auto may be charged with negligence if, without warning to a vehicle approaching from the rear, he turns his machine so that the rear vehicle is unable to stop or avoid a collision."

See, also Wesley v. English, 71 Fed. (2d) 392; Litherbury v. Kimmet, 183 Cal. 24, 195

P. 660; Thompson v. Smith (Mo.) 253 S. W. 1023, and cases cited. In the latter case it is said:

"The principle is so simple, so obvious and so just that there is, ordinarily, little room for doubt as to its application. It stands upon the same ground which should prevent one from casting a rock or discharging a gun across a busy highway without ascertaining that no one is in the path of the missile or notifying those who may be there, of his intention."

In C., R. I. & P. Ry. Co. v. Dizney, 61 Okla. 176, 160 P. 880, involving injury to a passenger on a passenger train, the trial court instructed the jury that if the plaintiff was free from negligence when he stepped into an open trap door which was in the vestibule of one of the coaches, and that if the jury believed that with the use of the utmost diligence the defendant could have had the trap door closed, the same would constitute a prima facie case of negligence. The railway company appealed, contending that this invaded the province of the jury. This court approved the instruction, under the circumstances of the particular case. The decision has several times been followed. In that case, as in this one, though different degrees of care are involved in the two cases, it could hardly be said that reasonable minds would differ on the inference involved. Certainly a railroad using the utmost degree of care for the safety of its passengers would not leave an open trap door in the proper path of a passenger; it is the same here,—a prudent driver would not suddenly turn tail and run back into a known fellow user of the highway without giving him some warning of such unusual maneuver.

Instruction No. 3 given by the trial judge reads as follows:

"Negligence, as used in these instructions, and as applied to this case, means the want of ordinary care. By ordinary care is meant such care as men of ordinary prudence usually exercise under the same or similar circumstances."

The pertinent part of instruction No. 8 reads as follows:

"* * * In this connection you are instructed that the term 'negligence' has been defined to you in another instruction herein, and it is a question of fact for you to determine under all the facts and circumstances in this case whether or not the truck did make a left-hand turn at the intersecting highways with knowledge of the approach from the rear of the car in which plaintiff was riding, as claimed by her, with-

out the persons in charge of said truck giving any signal or warning of their. intentions so to do, and whether such acts on the part of the persons in charge of said truck constituted negligence, as the term has been described herein."

Without question these instructions were correct, and we have so often held that the instructions must be considered together as a whole that it is unnecessary to discuss that question here. And aside from the reasons hereinbefore given why reversal should not be had because of the giving of the instruction complained of, when we follow the general rule that the instructions must be considered together as a whole, we have no difficulty in reaching the conclusion that, even though the instructions complained of might—standing alone—be erroneous, nevertheless, when all the instructions are considered together and with the evidence, the issues were fairly presented to the jury.

Much ado is made by defendant over the fact that the driver of the car in which plaintiff was riding failed to sound his horn. In Smith v. Clark, supra, it was pointed out that the driver of the rear car is under a duty to sound his horn before proceeding around the leading car. We fail to comprehend, however, why the failure to sound the horn should make any difference in this particular case, in view of the fact that defendant's driver admitted that he knew of the presence of the rear car, and further in view of the fact that this is not one of those cases wherein the rear car undertakes to pass the front car, but, on the contrary, proceeds in approximately the same line as occupied by that vehicle prior to the time when it left the pavement to the right. If the reason for the signaling does not exist, then there is no need to signal. If the defendant's driver knew of the presence of plaintiff, as he testified, then the sounding of plaintiff's horn could communicate no further information to the defendant's driver, other than that the driver of plaintiff's car might desire to pass. But the evidence in this record does not justify the inference that any effort was made by the driver of the rear car to pass the front car. On the contrary, the evidence is that the driver of the truck turned off the highway to his right, as if to follow the slight turn in that direction on to Pine street, and then suddenly turned about to his left, which caused the driver of the rear car to also turn his car to the left, so that both vehicles moved in an arc to the left, finally colliding on the left side of the road. Defendant's driver, having turned off to the right before turning back to the left, would have eventually struck the following car in any event, and regardless of whether that car remained on the right-hand or left-hand side of the road, since both vehicles were in close proximity during this sudden maneuver. It appears that the driver of the rear car, by being able to describe a part of a circle to the left, instead of colliding instantly with the truck, was maintaining probably more than normal control of that car. We may not overlook the human element in these cases; we think that it was entirely reasonable in the driver of the rear car, when the truck pulled off the highway to the right, to assume that that truck was going to proceed along the quarter turn east onto Pine street, but that when the very opposite course was suddenly assumed, it must have taken the driver of the rear car entirely by surprise. Also, if the driver of the truck had taken the course which common sense would indicate he intended to take, there would have been no reason for the sounding of the horn by the car in the rear.

We now consider the contention of the defendant to the effect that the court erred in permitting plaintiff's mother to remove plaintiff's glass eye from the eye socket in the presence of the jury, "* * * for the reason that said demonstrative proof was highly prejudicial and made for the sole purpose of inflaming and incensing the minds of the jury," etc.

In this connection defendant cites cases from other jurisdictions, almost all of them involving instances where dead members, such as amputated legs, were exhibited to the jury. In those cases the jury's inspection of the amputated portions of the body could have had no bearing upon the issues of the trial. Possibly the same result would be reached in this case as was reached in those cases if the removed eye had been preserved and presented to the jury, for it is obvious that such a demonstration could have neither proved nor disproved any material issue. Nothing was accomplished by this demonstration, however, other than to show the jury the real condition of plaintiff, which was a most important issue. The inconvenience of inserting and removing the eye, which operation the evidence revealed had to be performed several times daily, constituted a proper element of damage. After all, this was a form of wound, and wounds are ordinarily permitted to be shown the jury. The effect may have been somewhat ghastly as contended by defendant, but so was the injury itself, and we

perceive no reversible error in permitting the jury to see the condition which actually existed.

The defendant next contends that the $25,000 verdict is excessive and exorbitant and appears to have been given under the influence of passion and prejudice. We do not think that the size of the verdict indicates that it resulted from passion and prejudice. The plaintiff, a little girl of four years, must pass the remainder of her life in this mutilated condition. She has a longer period of suffering therefrom in front of her than would a person of mature years. Her embarrassment and humiliation, resultant from association with others, will be more intense than if she were a boy or man. The eye must be specially made, and requires renewal at least annually, according to the evidence. A white secretion exudes from the eye socket around the artificial eye, which must be removed several times daily and cleaned. It is removed at night. In addition there is some permanent disfigurement to the face, consisting of scars, though the extent and unsightliness thereof are left somewhat in doubt by the record, yet evidently were considered by the jury. Her chances of total blindness if the other eye should become injured are by this accident doubled. On paper, the loss of an eye is a combination of words carrying a rather tame significance. In practice the thing becomes much worse.

We see little to be gained by discussing verdicts in other eye cases. They range from a few thousand dollars up to $30,000 or $40,000. See, for instance, St. Louis & San Francisco Ry. Co. v. Stitt, 108 Okla. 42, 233 P. 1073, where this court sustained a $20,000 judgment for the loss of an eye by a man past 39 years of age. The loss of the eye, plus the disfigurement, plus the pain and suffering which was no small item, in itself, may well have merited the verdict in this case. It is well settled that, in determining whether a verdict is excessive, each case must be ruled chiefly on its own facts and circumstances. Sand Springs R. Co. v. McGrew, 92 Okla. 262, 219 P. 11. The amount of the verdict in this case does not appear to us to be excessive on first blush, in accordance with the well-known judicial remark on that subject, nor even on second blush, and it follows that in view of the fact that appellate courts should sparingly exercise the power to grant new trials on the ground of excessive damages (Sand Springs R. Co. v. McGrew, supra),

we are not inclined to disturb the amount thereof.

The remaining assignment of defendant is that the verdict is contrary to law and not supported by evidence. The review of the evidence and the discussion hereinbefore had, make it unnecessary to discuss this assignment. The judgment is affirmed.

McNEILL, C. J., and RILEY, WELCH, and CORN, JJ., concur. OSBORN, BAYLESS, and GIBSON, JJ., dissent. BUSBY, J., absent.