JOSEPH T. MEIEROTTO v. FRANK A. THOMPSON, Trustee, ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Debtor, Appellant.—No. 39984.—201 S. W. (2d) 161.

Division Two, March 10, 1947.

Motion for Rehearing or to Transfer to Banc Overruled, April 21, 1947.

*M. G. Roberts, A. P. Stewart, C. H. Skinker, Jr.,* and *Roscoe Anderson* for appellant.

*Everett Hullverson* for respondent; *Orville Richardson* of counsel.

36

38

WESTHUES, C.—Plaintiff obtained a judgment in the sum of $40,000 against appellant railway company in the Circuit Court of the City of St. Louis, Missouri. An appeal was perfected to this court.

Plaintiff's suit was brought under the Federal Employers' Liability Act. It was based upon a violation of the Boiler Inspection Act and common law negligence. On July 28, 1945, plaintiff, a fireman, was a member of a train crew operating a freight train between Clinton and Springfield, Missouri. A stoker was used to feed coal to the engine and the steam of the stoker was exhausted through a two inch pipe into the water tank on the tender. At various points along the route the tank was filled with water. When this was done at Osceola the crew did not notice a water leak. But at the next stop, Cliquot, Missouri, where the tank was filled, plaintiff noticed that water was running from the tender. An inspection was made and it was discovered that the pipe carrying the exhaust steam into the water tank had become disconnected. The crew had orders to take a side track at that point to permit a train to pass over the main line. After the crew moved the train to the side track the enginemen attempted to repair the pipe. It was discovered that a union connecting the ends of the two pipes had become loose and disconnected. To make the repair it was only necessary to join the two ends of the pipes and tighten the union. This, however, due to the force of the water flowing through the pipe, proved to be a difficult task. In the first place, because of the engineer's avoirdupois he could not get within close proximity of the disconnected pipe, so plaintiff was asked to make the attempt. Plaintiff willingly went under the tender and worked at the task for some time. He testified, and in this he was corroborated by other members of the crew, that when he would attempt to get the two ends of the pipes together the water would squirt against the tank and other parts of the tender throwing grease, oil, mud, sand and other accumulation in all directions. Plaintiff became very wet and dirty. The engineer testified that when plaintiff came from

under the tender he had grease and dirt on his face and in his ears and his clothing was dirty and wet. Plaintiff went under the tank a second time and while working noticed the water had stopped flowing from the pipe. The enginemen then discovered that a gooseneck in the pipe, located in the tank, prevented more water from flowing from the tank. It was decided that enough water remained to complete the run to ▮ Springfield, which was done, and no further attempt was made to repair the pipe.

Plaintiff testified that while he was attempting to make the repair water and dirt struck him in the face with great force and his eyes were covered with oil and dirt; that they became bloodshot and his left eye pained him; that it cleared up after a day or two and then became gradually worse. On August 7 he made a run to Kansas City, Missouri, and on August 8 a return trip to Springfield. He testified that on this return trip his left eye became so painful that it was difficult for him to perform his duties. On August 9 plaintiff consulted Dr. Carey Cheek. Dr. Cheek testified that plaintiff was suffering with a rodent ulcer; that he treated the eye for several days and that he was compelled to lance it because of the infection; that the ulcer caused complete blindness in the left eye.

Appellant in its brief contends the trial court erred in submitting the case to a jury for the reason that no violation of the Boiler Inspection Act was proven in that the alleged defect did not render the locomotive unsafe to operate. Appellant also urges that the only charge of negligence not abandoned was the alleged direction of the engineer to plaintiff to go under the tender and make the repair and that the evidence failed to show that such direction constituted negligence. Appellant makes the further point that no violation of the Boiler Inspection Act was proven because the engine at the time the repair was attempted had been taken out of service and was, therefore, not in use.

▮ There is no merit in this latter contention. The entire train was placed on a side track primarily for the purpose of permitting another train to pass over the main line track. While the train was on the side track the enginemen attempted to make the repair in order to complete their day's journey. Cases cited by appellant do not support the contention made. For example, in Harlan v. Wabash R. Co., 335 Mo. 414, 73 S. W. (2d) 749, the engine in question had been placed in defendant's roundhouse for repairs. During the repair work Harlan, a mechanic's helper, was injured. It will be noticed that in that case the plaintiff at the trial abandoned the charge of a violation of the Boiler Inspection Act. See 73 S. W. (2d) l. c. 754(7). A judgment for plaintiff was affirmed on some other theory under the Federal Employers' Liability Act. In Flack v. Atchison, T. & S. F. R. Co., 285 Mo. 28, 224 S. W. 415, the court in its opinion placed emphasis on the fact that the engine involved was being prepared for

use in interstate commerce. The man who lost his life while working on the engine was a boilermaker. The engine was, of course not then in use. Another case cited, New York, C. & St. L. R. Co. v. Kelly, 70 Fed. (2d) 548, is in reality authority against appellant. The court, speaking on the question, said:

"Had the car in question been en route to the repair place, a different situation would have been presented, but after it reached the repair place, was out of service, the carrier was entirely within its rights in taking off the handhold or any other of the safety appliances necessary to effect the repairs, without violating the Safety Appliance Act."

We hold that in this case the engine had not been taken out of service. In fact we find that the enginemen were attempting to make a repair so it could continue in service.

Neither is there any merit to the contention that "the alleged defect did not render the locomotive unsafe to operate without peril to life or limb." The members of the train crew testified that it was necessary to fill the water tank at all points along the route where water was stored for that purpose. This because the crew was required to do a great deal of switching of cars with the engine at the various stations along the route. It certainly would be dangerous to operate an engine without adequate water supply. Therefore, the jury was authorized to find that the defect rendered the engine unsafe to operate. The case of Brady v. Terminal R. Assn. of St. Louis, 303 U. S. 10, 58 Sup. Ct. 426, involved the question of whether an inspector, inspecting a car which had been placed on a delivery track by the Terminal for the Wabash, was protected by the Boiler Inspection Act. The inspector was injured when a grabiron gave way. This court in that case held he was not covered by the act. See Brady v. Terminal R. Assn. of St. Louis, 102 S. W. (2d) 903, 340 Mo. 841. But the United States Supreme Court held otherwise. If an inspector of such a car is protected by the act, then certainly plaintiff in this case should be and was protected when he attempted to make a repair to render the engine safe to operate. It was conceded, in fact appellant emphasizes that it was plaintiff's duty to make such repairs.

Appellant further states in its brief that the direction by the engineer to plaintiff to fix the stoker exhaust pipe was not negligence as a matter of law; that such direction was the only charge of negligence submitted to the jury. To this we cannot agree. The instruction, after submitting the alleged violation of the Boiler Inspection Act, further reads:

". . . and if you further find that in permitting the said pipes of said locomotive and tender to become separated and loosened and in ordering plaintiff to repair the same, if you so find, defendant was guilty of negligence and that plaintiff was injured as a direct result of such negligence, if any, then the Court instructs you that the

plaintiff is entitled to recover and your verdict must be in favor of the plaintiff and against the defendant."

It will be noted that the instruction submitted to the jury in the conjunctive the violation of the Boiler Inspection Act and also whether the acts on part of the defendant in permitting the pipe to become separated and in directing plaintiff to make the repair constituted negligence. The evidence was that the union was such that it would not suddenly come loose; that it would work loose gradually and had the pipe been inspected before the engine was taken out for service the defect could have been detected. A jury was therefore authorized to find that someone whose duty it was to make the inspection had been negligent. The charge of negligence submitted was supported by substantial evidence. Appellant, however, states that the instruction permitted a finding of negligence not pleaded, meaning, as we discern from the brief, negligence with reference to permitting the stoker to become loose. But we notice the following allegation in the petition covers this charge of negligence:

"4. (b) Defendant negligently and carelessly failed and omitted to exercise ordinary care to inspect the said locomotive, boiler, tender and appurtenances thereof when by such inspection defendant could have ascertained the condition and could have repaired the same and thus and thereby have prevented plaintiff from coming in contact with said water and other substances."

The next assignment in the brief reads as follows:
"The Court erred in giving and reading to the jury instruction No. 1 (Objections and Ruling thereon, Tr. 229-232); (Instruction 1, Tr. 235, 236); (Ground 3, Motion for New Trial, Tr. 263); because:
"a. It is misleading, confusing and instructs on an abandoned issue."

Ground three in the moton for new trial referred to reads as follows:
"3. The Court erred in giving and reading to the jury instruction number 1 over the definite objections, with grounds therefor, made during the trial by the defendant."

This is followed by citation of authorities. The "Objections and Ruling thereon", mentioned in the assignment, cover three pages in the record. Such an assignment in the brief, under points and authorities, does not preserve anything for our review. It wholly fails to comply with rule 1.08(3), which requires the brief to contain, "The points relied on, which shall specify the allegations of error, with citation of authorities thereunder." Appellant has wholly failed to specify any allegation of error. It is impossible to discern from the assignment what point appellant wishes to present. The motion for new trial does not aid us and it certainly would be speculative on our part to attempt to locate appellant's point in three pages of objections made to the instruction in the trial of the case. Metropolitan Pro-

perties Co. v. Rideout, 346 Mo. 787, 142 S. W. (2d) 1055; Hill v. Montgomery, 352 Mo. 147, ▆▆▆ 176 S. W. (2d) 284, l. c. 288 (5); Kleinschmidt v. Globe-Democrat Pub. Co., 350 Mo. 250, 165 S. W. (2d) 620. There are a number of other similar assignments in plaintiff's brief. They of course will not need any further comment.

▆▆▆ Error was assigned to the giving of an instruction informing the jury that under the Federal Employers' Liability Act assumption of risk would not bar a recovery if plaintiff's injuries resulted from the negligence of the defendant. Appellant contends this instruction should not have been given because it erroneously injected assumption of risk into the case, citing McCurry v. Thompson, 352 Mo. 1199, 181 S. W. (2d) 529 and Young v. Terminal R. R. Assn. of St. Louis, 192 S. W. (2d) 402. In the Young case the trial court refused to give an instruction for the defendant submitting assumption of risk as a defense. This court correctly ruled that assumption of risk *was not* a defense and therefore the instruction was properly refused. The same is true of the McCurry v. Thompson case. It is obvious that those cases are not in point. The instruction in the case before us correctly declared the law. Appellant insists that assumption of risk was not in the case. It is true that it was not pleaded, but under the evidence unless a jury was otherwise instructed it may well have found that plaintiff assumed the risk of being injured in the manner he was. Note the following evidence elicited by defendant's counsel:

"Q. You came out from under that engine; you didn't tell the engineer, or the fireman, that your eyes were hurt, did you? A. No, sir.

"Q. After you had been in there about twelve or fifteen minutes the first time, you came out, then you went back in, didn't you? A. Yes, sir.

"Q. And you made no protest about going back in to the engineer, did you? A. No, sir."

. . .

"Q. If you hadn't gotten under this tank, that water running out wouldn't have hurt you in any way whatsoever? A. If I had gotten under?

"Q. If you hadn't gotten in under the tank, the water running out wouldn't have hurt you at all, would it? - A. If I hadn't got underneath, I presume it wouldn't.

"Q. If you had stayed on the outside? A. If I had stayed on the outside.

"Q. Nothing would have happened? A. No, I suppose not."

In the argument to the jury appellant's counsel stated:

"When he got under there he said that the water was rushing out with great force, throwing dirt and grease all around, over him, at that time, filling his ears and face and clothing and so forth, but he continued to work from twelve to fifteen minutes, but he came out

from under there, and when he came out from under, if you will recall, gentlemen, he made no complaint, made no statement about having gotten anything in his eye, *and then he went back voluntarily.* Now, Mr. Meierotto, even after he had been in there this twelve or fifteen minutes, didn't consider that such a hazardous situation that he called it to the attention of the engineer—don't send me back in there, that is a dangerous place, it is a hazard to go in there; no, he didn't do that; he went back under there.'' (Italics ours.)

In a very recent case this court passed on this identical question. See Ford v. Louisville & N. R. Co., 355 Mo. 362, 196 S. W. (2d) 163, l. c. 168 (7). In the circumstances it was not error for the court to instruct that under the law plaintiff had not assumed the risk if injury was sustained through defendant's negligence.

■ Appellant attacks plaintiff's instruction on damages on the ground that it directed the jury to assess double damages for permanent injuries. In the forepart of the instruction the jury was told in substance that if it found a verdict for plaintiff it should ''. . . find the amount of damages to be such sum of money as will fairly and adequately compensate him for such injuries.'' · The instruction then proceeds to enumerate the various elements to be taken into consideration, such as plaintiff's age, earning capacity, nature of injuries, pain both past and future, disability, incapacity to earn money, loss of past earnings and loss to be sustained ■ in the future. The instruction concluded with the following clause:

''. . . and you may also assess damages for such permanent injuries as plaintiff has suffered.''

The forepart of the instruction dealt with pecuniary losses and pain and suffering. The concluding clause authorized damages for permanent injury. Appellant cited two cases: Keehn v. D. R. F. Realty & Inv. Co., 328 Mo. 1031, 43 S. W. (2d) 416 and Wild v. Pitcairn, 347 Mo. 915, 149 S. W. (2d) 800. These same cases and others were cited by respondent as authority to support the instruction. In the Keehn case the giving of a similar instruction was held not to justify a reversal. Three of the judges dissented. The dissent, however, was mainly based on the theory that the evidence did not show any permanent injury such as would manifest itself except by pain and suffering. The dissenting opinion also criticized the instruction because it was the only one requested by plaintiff. In the Wild case it was held that the giving of an instruction similar to the one before us was not prejudicially erroneous. All of the members of division one concurred in the opinion. In that case there was a permanent injury. In the case now before us the plaintiff sustained a permanent injury, being the total loss of the sight of one eye. It is the law, well accepted, that a permanent injury is in itself, aside from the pecuniary loss, an element of damage. 25 C. J. S. 546, sec. 57; Wilson v. Spicuzza, 135 S. W. (2d) 53; Hill v. Kansas City R. Co., 233 S. W. 205. We hold

46.

that the giving of the instruction in this case does not justify a reversal of the judgment. As was said in the Keehn case, supra:

."While the form of the instruction is not to be commended, the jury would clearly understand that in awarding damages they were to consider whether the injuries were temporary or permanent, and simply award fair compensation."

In the Wilde case, supra, the court said:

"However, as pointed out in the dissenting opinion in the Keehn case, supra, such an instruction should not be given unless the evidence justifies it. Also caution should be used to avoid any idea of a double award and Section 3 could be couched in clearer terms."

█ Appellant urges that the trial court committed error in permitting plaintiff to introduce evidence in rebuttal to that of Dr. Cheek. Dr. Cheek treated plaintiff's eye. He testified for the defendant. His testimony was that a rodent ulcer was present in plaintiff's eye and destroyed its vision; that a rodent ulcer progresses very rapidly; that within twenty-four hours or so after its inception there is great pain and in a few days the eyeball is destroyed. This evidence was introduced on the theory that plaintiff's eye infection was not the result of the occurrence of July 28. Dr. Howard in rebuttal testified that he had examined plaintiff's eye on October 23 and December 6, 1945, and had listened to the evidence given by Dr. Cheek. He concluded from the examination of plaintiff and the evidence of Dr. Cheek that the infection in plaintiff's eye was not a rodent ulcer. Dr. Howard further testified that the proper treatment for a rodent ulcer is hospitalization of the patient and injection of a typhoid vaccine. The evidence was that Dr. Cheek did not give this vaccine or send plaintiff to a hospital. The evidence of Dr. Howard was in rebuttal to Dr. Cheek's evidence and therefore proper. The evidence further disclosed that Dr. Howard and Dr. Cheek were both eye specialists. Dr. Howard had written a number of books on the diseases of the eye and the treatment thereof.

██ In the argument to the jury defendant's counsel contended that plaintiff's loss of sight was due to a rodent ulcer; that such an ulcer would not have developed as a result of the occurrence of July 28, because a rodent ulcer progresses very rapidly as Dr. Cheek had testified. Plaintiff's counsel argued that the ulcer was caused by the occurrence of July 28 and contended that it was probably not a rodent ulcer. The question was for a jury and there was sufficient evidence to justify a finding that plaintiff's eye infection, whether it was a simple ulcer or a rodent ulcer, █ could have been caused by the incident of July 28. Dr. Cheek testified that it was not beyond possibility that a simple ulcer may have been present and the rodent ulcer may have developed a day or so before he treated plaintiff. Appellant objected to the argument of plaintiff's counsel and assigned as error the ruling of the trial court in overruling the objection. As we view

the situation plaintiff's counsel argued that if plaintiff's eye had been infected with a rodent ulcer he would have been sent to a hospital and given the typhoid vaccine. We hold the argument was within the issues and the evidence. The trial court did not abuse its discretion in overruling the objection.

Now to the ever vexing and difficult question of whether the verdict is excessive. Appellant urges that the amount of the verdict itself is so excessive as to indicate passion and prejudice on part of the jury. This court has had before it many cases where the amounts as found by a jury were held to be grossly excessive. In a vast majority of such cases remittiturs have been required and very few have been remanded for new trial. We are of the opinion that in this case the matter can be taken care of by remittitur. Plaintiff urges that the verdict is not excessive. He insists that the pecuniary loss due to the loss of future wages, figuring plaintiff's expectancy of life, amounts to nearly $30,000. We will approach this question by considering the evidence in its most favorable light to the plaintiff. Plaintiff was forty-one years of age when injured. He was living in Springfield, Missouri, was married and had two children, twelve and fourteen years of age. In the twelve months immediately prior to his injury he had earned $3,887. During the calendar months of 1944 he had earned $4,387. He was next in line to be a regular engineer, in fact he had attained that status at the time of his injury but was working as a fireman until work as an engineer was available. An engineer's pay was about two dollars more per working day than that of a fireman. Plaintiff had been employed by the Frisco since December, 1925. The evidence justifies the assertion that he was a trustworthy employee and a man of excellent habits and good health. The loss of the eye will not permit plaintiff to continue his employment as fireman or engineer and therefore his earning capacity has been materially reduced. The ulcer causing the loss of his eye, whether rodent or otherwise, was very painful and of course the disfigurement and injury are permanent. There is a remote possibility that the eye may have to be removed which may affect the right eye to some extent. Considering all of these elements, especially the item of loss of earning capacity, we deem that $30,000 will be a liberal sum to compensate plaintiff for his loss. Without discussing this question at length we call attention to the following cases and authorities which were considered in arriving at this amount. We are also taking into consideration the value of the dollar at the present time. Russell v. Mo. Pac. R. Co., 316 Mo. 1303, 295 S. W. 102, l. c. 104 (8, 9) ; Cunningham v. Doe Run Lead Co., 26 S. W. (2d) 957, l. c. 961 (12) ; Ford v. Louisville & N. R. Co., 355 Mo. 362, 196 S. W. (2d) 163, l. c. 170 (13) (14, 15) ; Howard v. Mobile & O. R. Co., 335 Mo. 295, 73 S. W. (2d) 272, l. c. 276 (5) ; Morris v. E. I. Du Pont De Nemours Co., 346 Mo. 126, 139 S. W. (2d) 984, l. c. 988 (8, 9) ; 25 C. J. S. 977, sec. 198 (2). In St. Louis-San Fran-

cisco. Ry. Co. v. Stitt, 108 Okla. 42, 233 Pac. 1073, a judgment for $20,000 was sustained for the loss of an eye by a man thirty-nine years of age. In Shell Petroleum Co. v. Perrin, 179 Okla. 142, 64 Pac. (2d) 309, l. c. 315, a judgment for $30,000 was sustained in favor of a girl four years of age for the loss of one eye and disfigurement of her face. In this latter case the court commented:

"On paper, the loss of an eye is a combination of words carrying a rather tame significance. In practice the thing becomes much worse."

In Katz v. Helbing, 215 Cal. 449, 10 Pac. (2d) 1001, l. c. 1003 (6), a $30,000 judgment was allowed to stand for the loss of an eye where much future discomfort and pain were probable. See also Maede v. Oakland High School Dist., 212 Cal. 419, 298 Pac. 987, l. c. 990 (2, 3); Newell v. Detroit T. & I. R. Co., 235 Mich. 687, 209 N. W. 813.

If, therefore, plaintiff will within fifteen days file in this court a remittitur of $10,000 the judgment will be affirmed as of the sum of $30,000 bearing interest from the date the judgment was entered in the trial court, otherwise the cause to be reversed and remanded for retrial. *Bohling* and *Barrett, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.