Joseph BINE, Respondent,

v.

**STERLING DRUG, INC., Appellant.**

No. 52863.

Supreme Court of Missouri, Division No. 1.

Jan. 8, 1968.

Thomas C. Hullverson, Hullverson, Richardson & Hullverson, St. Louis, for respondent.

Wilton D. Chapman, Arthur Litz, St. Louis, for defendant-appellant, Sterling Drug, Inc.

HIGGINS, Commissioner.

Appeal from $125,000 remitted judgment on $175,000 jury verdict to plaintiff for permanent eye damage resulting from drug manufacturer's failure to warn his doctors of the dangers of a prescribed drug.

Chloroquine phosphate, sold under trade names Aralen, Triquin, and Plaquenil, is a drug invented by Sterling in 1946 for the prevention 'and treatment of malaria. In 1955 Sterling introduced the drug to druggists and the medical profession for treatment of arthritis and lupus erythematosus. The drug has certain side effects, one of which is its affinity for melanin pigment in the eyes resulting in a condition now known as chloroquine retinopathy, a degeneration of cells in the retina of the eye, causing blindness. Joseph Bine, 54 years of age at trial, was first treated in Detroit, Michigan, in 1952 for disseminated or systemic lupus erythematosus. In 1954 he went to St. Louis, Missouri, and came under the care of Dr. Ernest T. Rouse, an internist, and Dr. Henry Conrad, Jr., a dermatologist, for his condition. Under prescription from his doctors he began taking Aralen in late 1954, one.to three pills per day, until November 1960. In February 1961 he was put on Plaquenil which he took until September 1961. He had worn glasses for 18 to 20 years but had no eye trouble before taking Aralen. He first noted occasional blurring when reading after starting on Aralen in 1954. In June 1959 he saw Dr. Lawrence T. Post, complaining of difficulty with near vision and "bizarre visual sensations." By October 25, 1960, his right eye was bothering him but he could see "quite well" with his left eye. Dr. Post made tests and charted his findings. At this time the blind spot in plaintiff's right eye was slightly larger than normal, but there was a very definite change in the visual field next to the center of fixation of vision. Dr. Post wrote Dr. Rouse recommending discontinuance of Aralen since less toxic drugs were now in existence. Plaintiff was then taken off Aralen and took nothing until he began with Plaquenil in February 1961. Dr. Post's examination of January 15, 1962, showed that vision in plaintiff's right eye had begun to fail and vision in the left eye was worse. These conditions progressed until in November 1965 plaintiff was virtually blind in his right eye and the left

eye had developed "a real ring blind spot." By January 1966 the central vision in plaintiff's right eye was 1/200 and there was an island of complete blindness. The central vision of the left eye was 20/25 and, on visual field testing, there was a spot with "a seeing area right in the center, something like the shape of a doughnut." Ophthalmoscopic examination showed retinal changes around the macula "and right in the center of the eye where the seeing part is the retina did look somewhat degenerated." Plaintiff was forced to quit his job in December 1961, at which time he was earning $100 per week. By trial time the same job paid $225 per week. Drs. Post, Sanders, and Bernstein were of the opinion that plaintiff's eye condition was permanent and due to chloroquine, and Drs. Post and Sanders said the condition was not caused by plaintiff's lupus. Additional evidence will be stated as necessary in connection with appellant's points.

Appellant charges: "The Court erred in not sustaining appellant's motion for a directed verdict at the close of all the evidence on the ground that there was no evidence adduced of any reliance by plaintiff's doctors of a lack of warning and thus no causal connection was shown between plaintiff's injury and appellant's alleged negligence." Stated in reverse, this point is limited to a contention that plaintiff's case on proximate cause fails because there was no evidence of reliance by plaintiff's doctors on a lack of warning. In argument appellant refers to evidence on what it did by way of warnings and to testimony of plaintiff's doctors that they read literature on the drug and used their skill in setting the dosage, all of which is beside the point.

Plaintiff's case was submitted by Instruction 2:

"Your verdict must be for the plaintiff if you believe:

"FIRST, defendant sold Aralen for use in the treatment of lupus erythematosus, and

"SECOND, Aralen would cause serious damage to the retina of the eyes of some individuals using such drug on long term therapy in the manner and for the purpose intended, and

"THIRD, defendant knew or by using ordinary care could have known of the danger of such eye damage, and

"FOURTH: plaintiff and his doctors did not know and by using ordinary care could not have known of such danger, and

"FIFTH, plaintiff used Aralen on long term therapy under prescription from his doctors and in the manner and for the purposes intended, and

"SIXTH, defendant failed to give a timely and adequate warning to those members of the medical profession whom the defendant, in the exercise of ordinary care on its part, might reasonably expect to prescribe the drug and, by ordinary care on their part, to note and heed such a warning if one were given, and

"SEVENTH, defendant was thereby negligent, and

"EIGHTH, plaintiff was damaged as a direct result thereof."

Defendant makes no charge of error in connection with plaintiff's submission and its converse theory was submitted by Instruction No. 3:

"Your verdict must be for defendant if you do not believe: defendant knew or should have known of the danger that the drugs in question could cause a serious disorder to the retina of the eyes in some individuals on long term therapy using the same, at the time plaintiff used the drugs."

▮ Under this submission it is obvious and may be said, as in Sterling Drug, Inc. v. Cornish, 8 Cir., 370 F.2d 82, 85 [5], where it was argued that a failure to show reliance was an intervening proximate cause: "The sole issue was whether appellant negligently failed to make reasonable efforts to warn appellee's doctors. If

appellant did so fail, it is liable regardless of anything the doctors may or may not have done. If it did not so fail, then it is not liable for appellee's injury. The issue was to be resolved by the jury * * *." See also Yarrow v. Sterling Drug, Inc., D.C.S.D., 263 F.Supp. 159, 163 [6], and see Krug v. Sterling Drug, Inc., Mo., 416 S.W. 2d 143, 150–151 [5], resolving virtually this same point against Sterling and distinguishing the citation, Oppenheimer v. Sterling Drug, Inc., 7 Ohio App.2d 103, 219 N.E. 2d 54, upon which Sterling relies.

█ Appellant's next point is also related to causation: "There was no evidence in the case showing that the state of scientific knowledge was such that the medical profession knew of any alleged connection between chloroquine retinopathy and Aralen prior to 1959." The argument clarifies this point to state it as a contention that "Plaintiff produced no evidence * * * that the state of medical knowledge at the time plaintiff consumed the chloroquine was such that the defendant in the exercise of ordinary care could have anticipated that the drug would cause retinal eye damage." However, under Instruction No. 2 the question, if one be stated at all by this point and argument, is whether there was evidence to show that defendant, Sterling Drug, knew or by using ordinary care should have known that Aralen would cause "serious damage to the retina of the eyes" of some users of the drug.

As previously stated, Mr. Bine took chloroquine phosphate under the trade name Aralen, as prescribed by his doctors for his lupus condition from 1954 until November 1960 when his doctors took him off the drug. He resumed the drug as prescribed by his doctors under the trade name Plaquenil February 1961 and remained on it until September 1961. As early as 1953 or 1954, according to Dr. Justus B. Rice, director of medical research for Sterling, Sterling became aware that doctors were prescribing Aralen for lupus in dosages of one, two, or three pills per day as compared to the one or two pills per week dosage for malaria. In addition to its director of research, Sterling employed a medical staff, had a medical library and research institute, and received reports and letters from doctors in the field as well as reports from their own "detail men" who were field representatives for Sterling in contact with doctors in the prescribing and treating field. From these, Sterling knew that visual disturbances had been experienced with Aralen even in the malarial dosage. It knew of an article by Alving, et al., in 1948, describing visual disturbance side effects resulting from higher dosages, and it knew of Aralen's toxic effects where used in higher dosages than those recommended for malaria. The letters, one of which was from Dr. Weiss, Dr. Conrad's associate, and reports from doctors prescribing Aralen, reporting to and questioning Sterling about connections between Aralen and eye damage, began as early as 1954 and were received by Sterling frequently during the time Mr. Bine was on the drug. Corneal opacities were reported to Sterling in 1957 and 1958; retinal damage possibilities were suggested in March 1957, January 1959, and definitely in an English article by Hobbs, et al., in October 1959. Defendant conducted tests with chloroquine at its research institute from 1944 to August 1959. At trial, the director of research stated they had "never been able to reproduce the so-called chloroquine retinopathy" but the description of the animal tests performed disclosed that defendant performed only a few tests for chronic toxicity and none for eye damage. Dr. Foley, defendant's medical director, was aware that testing by Sterling had shown that some of the animals had blurring of vision. In 1955 Sterling was recommending Aralen for treatment of lupus and its booklet at that time reported side effects as "insignificant," listing those side effects, including blurring of vision, which were mentioned in the 1946 booklet published in connection with Aralen for treatment of malaria where it was said that "none of these manifesta-

tions has been constitutionally serious and all have been readily reversible." In 1957 defendant obtained approval from the Federal Drug Administration to advertise Aralen for lupus and rheumatoid arthritis. Its booklet then went out to physicians stating that "long-term management of lupus erythematosus with doses of 250 to 750 milligrams (1 to 3 pills) daily have been employed without serious side effects" and "although some untoward reactions may be encountered, they do not incapacitate the patient and are always reversible on diminished dosage or withdrawal of the drug." In 1958 defendant was informing its salesmen that "there is no known true contraindication to the use of Plaquenil or Aralen" and "no precautions or preventive measures required before, during or after the use of Plaquenil or Aralen * * * do not require frequent patient check-ups" and "untoward effects are limited in type and, with rare exception, are insignificant." The 1958 products card reported "visual disturbances" and other complaints under side effects, again referring to these as "insignificant" and "readily reversible." Similar assurances were made in another booklet entitled "Advantages of Plaquenil and Aralen over Adrenocortical Therapy" and in Physicians' Desk Reference books up to 1959. The July 1959 products card mentioned corneal changes as reported by Dr. Calkins and others and, on May 15, 1960, Sterling advised the F.D.A. of the reported retinal changes. Later, the Hobbs report findings were mentioned, and not until February 1963 did defendant send out its letter to 248,000 doctors in the United States warning about retinal damage or chloroquine retinopathy. According to the medical testimony, retinal damage appears in the eyes of some Aralen users after a minimum of nine-months' usage. Mr. Bine first experienced his blurring vision as early as late 1954, a time when the early stages of eye damage are reversible upon reduction of dosage or discontinuance of the drug. Dr. Post's examination disclosed no retinal damage, and only slight macular changes were noted

in June 1959. Retinal changes were minimal in October 1960 and probably then reversible; however, in January 1962 the condition was definite and irreversible.

■ It is not necessary to review all the record that might bear on this issue because this is sufficient to demonstrate that there were both scientific tests and medical knowledge, literature, reports, and questions as early as 1957 and certainly by 1960 connecting Aralen with serious retina damage by which Sterling "knew or by using ordinary care could have known of the danger of eye damage"; or, stated yet another way, "Sterling knew or had reason to know that some persons would be injured by the drug's side effects." Yarrow v. Sterling Drug, Inc., supra, 263 F. Supp. 1. c. 162. Also in this connection, the manufacturer of a prescription drug to be administered to human beings is " 'held to the skill of an expert in that particular business' and 'to an expert's knowledge of the arts, materials and processes,' and is bound to keep reasonably abreast of scientific knowledge and discoveries concerning his field and, of course, is deemed to possess whatever knowledge is thereby imparted.' " Krug v. Sterling Drug, Inc., supra, 416 S.W.2d 1. c. 152 [8].

Relying upon the general rule "that a manufacturer must give an appropriate warning of any known dangers which the user of his product would not ordinarily discover," Briggs v. National Industries, 92 Cal.App.2d 542, 207 P. 2d 110, 112 [3], a statement that there is no negligence for giving a blood transfusion where "under the present state of science there is no practicable way to determine whether whole blood taken for transfusion carries homologous serum hepatitis," Whitehurst v. American National Red Cross, 1 Ariz.App. 326, 402 P.2d 584, 585, and cautioning against assessing negligence against defendant for failure "to anticipate what later research and scientific investigation proved to be a fact," La Porte v. United States Radium Corp., D.C.N.J., 13 F.Supp. 263, 272 [1],

appellant argues: " 'Chloroquine retinopathy' was unknown to medical science prior to the label of such being affixed in the Hobbs Article * * * yet plaintiff * * urge(s) that Appellant would still be liable for knowledge neither it nor others possessed in the field at the time plaintiff ingested Aralen, so that a warning was available and was not given and could have been effective to lessen his damage."

Neither the cases nor the argument is in point. It has been demonstrated previously that the evidence was sufficient to permit a finding that defendant knew or by the exercise of ordinary care should have known that serious eye damage would result to users of Aralen. This knowledge was shown to be available as early as 1957 and no later than 1960, during the period when Mr. Bine was on Aralen and prior to the time his condition was shown to be irreversible, which is the important time rather than the time Mr. Bine took his first pill. The submission is not that of failing to discover a disease later called "chloroquine retinopathy," but is whether defendant knew or in the exercise of ordinary care should have known of "serious damage to the retina of the eyes" of some users of Aralen. This is true also of appellant's contention that it was not able to discover the high affinity of chloroquine for melanin pigment in the eye or its effect upon the seventh layer of the retina (as others later found) because this also would not excuse defendant if, in the exercise of ordinary care, it knew or should have known of the drug's potential for serious eye damage. In other words, it is not the label or tag but the condition itself for which appellant may be held liable under Instruction No. 2.

■ In an attempted avoidance of its duty to warn under the submission of this case, appellant contends, Point III: "A drug manufacturer is not under a duty to warn users of the possibility they might suffer a peculiar allergic or idiosyncratic reaction when using its products." This point is related to Point IV: "The court

erred in refusing to give Instruction 'C' offered by appellant and thus prevented the jury from passing on the valid defense of idiosyncrasy." The refused instruction directed a verdict for defendant if the jury believed "that plaintiff's eye condition was caused by an unusual hypersensitivity or idiosyncratic reaction peculiar to him and unforeseeable at the time he used drugs in question."

Appellant argues the point by reference to evidence showing that plaintiff was one of a very small group which sustained retinopathy following chloroquine therapy; that he was one out of 500 who, according to Drs. Rouse and Conrad, developed the condition from use of the drug; that he was one out of the 1,000 whom Dr. Bernstein reported as a retinopathy case resulting from use of chloroquine. Also emphasized are the definitions given by some of the witnesses of "idiosyncrasy" and "allergy." Similar statistical data appeared in the Krug case and it is important to note, as in the case of Dorothy Krug, that no witness testified that Joseph Bine was either allergic to or idiosyncratic in reaction to chloroquine and, further, that the evidence was that there was no connection between his lupus and his eye damage.

It is of importance also to note that appellant here, as in the Krug case, relies principally on Merrill v. Beaute Vues Corp., 10 Cir., 235 F.2d 893, and a number of cases from other jurisdictions distinguished in Krug v. Sterling Drug, Inc., supra, 416 S.W.2d 1. c. 151 [6].

In this posture, the point is the same as that in Krug v. Sterling Drug, Inc., supra, 416 S.W.2d 1. c. 151 [6]: "The appellant's third claim of nonliability as a matter of law, and as another subsidiary point failure to give an instruction, is that it had no duty to warn 'an unidentifiable small class of users of the possibility they might suffer a peculiar allergic or idiosyncratic reaction' to its drug. It is said (as in the previous point in this case) that this is

especially true of a condition that came into medical knowledge after plaintiff had used the drug for some time."

Since these points are the same as those in the Krug case, they are denied by the same holding. See Krug v. Sterling Drug, Inc., supra, 416 S.W.2d l. c. 151–152 [6].

Appellant charges error in refusing to give its Instruction D "and by doing so led the jury into confusion in interpreting Instruction 4 * * * defining * * * 'negligence' and Instruction 5 * * * defining 'ordinary care.'"

■ Instruction D would have stated that "'negligence' as used in these instructions means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by other members of defendant's business." Given Instruction 4 informed the jury that "'negligent' as used in these instructions with reference to the defendant means the failure to use that degree of care that an ordinarily careful and prudent expert engaged in the same business would exercise under the same or similar circumstances."

Instruction 4 was proper as opposed to refused Instruction D. After discussing the duty of the drug manufacturer in cases of this nature, the court concluded in Krug v. Sterling Drug, Inc., supra, 416 S.W.2d l. c. 152 [7, 8], "it follows as a matter of course that there was no error in the court's giving Instruction 4 defining 'negligence' as 'failure to use the skill of an expert in the defendant's business.'"

■ Appellant says the court erred in refusing to permit introduction of answers to the letters of inquiry from various doctors who wrote to the company concerning possible connection between Aralen and retinal eye problems.

A part of plaintiff's evidence consisted of a number of letters from doctors over the United States. These were received in evidence without objection on the issue of notice to defendant of the dangers en-

countered in the use of Aralen. There also were in evidence communications from several of Sterling's field representatives reporting side effects from use of Aralen encountered by Drs. Edelstein, Weiss, Appleyard, Goldman, and Grear in the prescribing and treating field.

The answers which are the subject of this point were first mentioned in the evidence near the close of defendant's case. At that time counsel for defendant had Sterling's Exhibit Y marked for the purpose of identification and then asked for a bench conference out of the hearing of the jury.

"MR. THOMAS CHAPMAN: On behalf of the defendant Sterling, I want to object * * * to the refusal of the Court to grant the defendant the right to enter into evidence documents which are true copies of the answers * * * by Sterling Drug Company to letters of inquiry which have already been introduced in evidence, by showing copies of such inquiries by various doctors who were writing to the Sterling Drug Company seeking information as to the possible effects of chloroquine on the retina of the eyes of their various patients. I believe that in the interest of the administration of justice, that if the letters of inquiry can be shown and is permissible evidence * * * then in simple justice we should be able to introduce documents which show that the inquiries were observed and they were acted upon and letters were written to these various doctors; otherwise the defendant * * is put in the position that the evidence shows inquiries were made by these various doctors and that they were ignored by the Sterling Drug Company.

"THE COURT: You wholly misconceive the purpose of the offers and the rule of law under which the Court admitted them; they were received on the issue of notice. I could let in evidence only the fact that you received them, which emphasized the point of notice, but no self-serving answer would be admissible. * * I sustain the objection." Without further

reference to Exhibit Y, defendant proceeded to the close of its case.

Appellant's argument as to the admissibility of Exhibit Y appears to be that the letters comprising the exhibit would show the exercise of appellant's proper degree of care in advising and warning physicians that they were "part of a mutual correspondence," that they were answers given in the usual course of business, and showed that appellant had not ignored the letters of inquiry which were in evidence.

The items comprising the exhibit were not identified other than in the manner quoted from the bench conference and the record does not contain or reveal their contents; and, upon refusal of the exhibit said to be explanatory of defendant's situation, defendant made no request to limit the letters in evidence to the issue of notice.

■ A trial court has considerable discretion in the exclusion of evidence, and unless there was an abuse of that discretion, its action will not be cause for reversal, Counts v. Thompson, 359 Mo. 485, 222 S.W.2d 487, 493 [8]; and a number of reasons support the court's exercise of discretion in excluding this evidence. The record does not show any foundation to have been laid for admission by identification or authenticity of the items comprising the exhibit, Cummins v. Dixon, Mo., 265 S.W.2d 386, 394 [6–10], 47 A.L.R.2d 441; that appellant did not ignore the letters of inquiry could have been shown by Drs. Rice and Foley who ran Sterling's research department and, as to the items in the exhibit showing care appellant used in respect to its duty to warn, being written in the usual course of business, or as part of a mutual correspondence, it appears that these reasons were not stated to the court in support of the offer and, consequently, cannot now be used to convict the court of error, Sorrell v. Hudson, Mo., 335 S.W.2d 1, 6 [8–11]. Further, it appears from counsel's bench description that the offer would have been, as stated by the trial judge, "self-serving," Waterous v. Columbian Nat. Life Ins. Co., 353 Mo. 1093, 186 S.W.2d 456, 460 [8–14]; and, finally, appellant, by its failure to provide the content of the letters, has failed to show where it has been prejudiced on the merits of its case by the court's ruling. Johnson v. Lee Way Motor Freight, Mo., 261 S.W.2d 95, 98 [4, 5].

■ In the course of argument to the jury, plaintiff's counsel was arguing that plaintiff's loss of wages alone would amount to $158,000 "without any consideration for past pain and suffering, and without any consideration for the suffering that man is going to have to go through when he finally is given a white cane in a—

"MR. MILTON CHAPMAN: I object * * *. It's an attempt to inject an appeal for sympathy, prejudice and bias in the minds of the jury.

"THE COURT: It's an expression in common usage and the objection is overruled. As I said before, there will be ample time for defense counsel to make their arguments.

"MR. HULLVERSON (continuing for plaintiff): In a day and age when 3 and 400,000 dollar figures are thrown about this country for football players and whatever, I don't think that figure is out of line for Joe Bine for what the Sterling—

"MR. WILTON CHAPMAN: I object * * *.

"THE COURT: The objection must be sustained. * * *

"MR. WILTON CHAPMAN: And I move for a mistrial and discharge of the jury.

"THE COURT: Motion for a mistrial is denied but the jury are directed to disregard the reference to baseball players or football players, which has nothing whatever to do with this case and has no proper place in the argument."

Appellant's charge of error in permitting the reference to the white cane and in

refusing the request for mistrial was properly ruled.

There was evidence on the present and future state of plaintiff's blindness from which the jury could infer that he would be totally blind and figuratively "a man with a white cane." As observed by the court, the expression is common and descriptive of a condition shown by the evidence. See Kivett v. Stanley, Mo.App., 305 S.W.2d 739, 743 [12], where counsel was permitted to characterize plaintiff as a cripple where such was a fact, and Silverstein v. St. Louis Public Service Co., Mo., 295 S.W.2d 37, 41–42 [6], where the argument that a pedestrian was "trapped" was proper where the evidence supported such expression.

As to the second portion of the argument, the only relief requested was a mistrial which, if granted, would have produced a drastic result. A trial court necessarily must be allowed a substantial discretion in determining the need for a mistrial, and it also has an opportunity to review the effect of his ruling denying such a request when ruling the motion for new trial, Martin v. Sloan, Mo., 377 S.W. 2d 252, 263 [17]; and where, as here, the court promptly sustained the objection to plaintiff's argument, advised the jury of its impropriety, and admonished the jury to disregard it, an abuse of discretion is not indicated. Randazzo v. Polizzi, Mo., 366 S.W.2d 380, 381–2 [1].

Without advising how they relate to its case, appellant cites: (1) Villinger v. Nighthawk Freight Service, Mo.App., 104 S.W.2d 740, 742–3 [4]; (2) Dunn v. Terminal R. Ass'n of St. Louis, Mo., 285 S.W. 2d 701, 709; and (3) Green v. Ralston Purina Co., Mo., 376 S.W.2d 119, 127. They are not determinative here. In (1) counsel went outside the record in misquoting testimony to make it appear that defendant had wilfully injured plaintiff; in (2) counsel went outside the record to coin vituperative remarks, and in (3) the argument condemned was the poor man-big corporation theme.

Since none of these charges of error entitle plaintiff to a new trial, there could be no such entitlement on appellant's theory of " 'cumulative, prejudicial effect of the various errors.' " Krug v. Sterling Drug, Inc., supra, 416 S.W.2d 1. c. 154.

Appellant's final request is for this court to "hold that the verdict was excessive and grant a new trial or order a remittitur."

Appellant does not argue or attempt to demonstrate that this verdict is a result of bias and prejudice which, if so, would authorize a new trial, but limits itself to a statement of plaintiff's disability (as seen by appellant) supported by a list of several cases "as possible guide lines * * * for the Court to consider in line with the Rule of Uniformity of jury verdicts * * *."

According to the evidence viewed in the light most favorable to plaintiff, Meade v. Kansas City Public Service Co., Mo., 250 S.W.2d 513, 517 [5], plaintiff's eye damage was the result of taking Aralen rather than being caused by his lupus condition. His other ailments, testicular tuberculosis and heart condition, appeared to be in the past and, like his lupus, under control at trial time. His blindness, his inability to work due to blindness, his pain and suffering, past and future, and his loss of earnings, past and future, all are shown to result from the condition caused by Sterling's drug, Aralen. At his age, 54, it is reasonable to expect that plaintiff will suffer these losses and injuries for several years in the future.

This is not exhaustive of the evidence on plaintiff's injuries and damages but is indicative of that which persuaded the jury verdict of $175,000. The trial judge cut the verdict to $125,000 and "when the trial court * * * actually considers the matter of the excessiveness of the verdict and, by ordering a remittitur, gives an affirmative expression of its own considered view as to what the size of the verdict

should be, the appellate court, while concededly not bound by the trial court's action, nevertheless accords it very great weight, and indeed regards it as so strongly persuasive that except in a case which calls unmistakably for a greater reduction, the judgment left to stand by the trial court will not be disturbed on the appeal." Couch v. St. Louis Public Service Co., Mo.App., 173 S.W.2d 617, 626 [16]. See also Cook v. Kansas City, 358 Mo. 296, 214 S.W.2d 430, 434 [13, 14]; Cruce v. Gulf, M. & O. R. Co., 361 Mo. 1138, 238 S.W.2d 674, 681–2 [15–20]; and Myers v. Karchmer, Mo., 313 S.W.2d 697, 711 [25, 26]. As indicated in Krug v. Sterling Drug, Inc., supra, 416 S.W.2d l. c. 154 [14], cases such as Meierotto v. Thompson, 356 Mo. 32, 201 S.W.2d 161, Stith v. St. Louis Public Service Co., 363 Mo. 442, 251 S.W.2d 693, 34 A.L.R. 2d 972, and O'Brien v. L. & N. R. Co., 360 Mo. 229, 227 S.W.2d 690, "are not too helpful or persuasive," and this is particularly true where other verdicts in this particular type of case are contemporaneously comparable, e. g., Krug v. Sterling Drug, Inc., supra, $125,000 to 43-year-old woman and no evidence of loss of earnings; Sterling Drug, Inc. v. Cornish, supra, $110,000 verdict remitted to $80,000, not questioned on appeal; Yarrow v. Sterling Drug, Inc., supra, trial judge award of $80,000 to 48-year-old housewife.

Under these circumstances, the rule of uniformity is satisfied and further remittitur is not indicated.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HENLEY, P. J., and STORCKMAN, J., and CRAIG, Special Judge, concur.

SEILER, J., not sitting.